412 P.2d 710

In the Matter of a Member of the State Bar of Arizona, Martin S. ROG-
ERS, Respondent.

No. 8649.

Supreme Court of Arizona.

En Banc.

March 30, 1966.

J. Mercer Johnson, Tucson, for respondent.

Thomas Chandler, Tucson, for State Bar.

McFARLAND, Justice:

Formal charges were filed against Martin S. Rogers, hereinafter referred to as re-

spondent, to the effect that he had violated the Canons of Professional Ethics of an attorney at law.

The charges upon which the board of governors found against the respondent grew out of the handling of the estate of Olivia M. Kuhlmann, deceased, while he was executor. The board of governors found that:

Count One, he had purchased from himself individually a certain 1957 Ford automobile for the sum of $825.00, and that said sum was greatly in excess of the fair market value of the automobile, contrary to Canon 6 and Canon 11 of the canons of professional ethics;

Count Two, respondent paid to his son and daughter-in-law $300 a month for caring for the dog named "Star," said sum being exorbitant and excessive, and that thereby respondent had used his position as executor of the estate for personal gain and benefit of his family. He had purchased a 1963 Pontiac Bonneville station wagon for the sum of $5,277.93 for the alleged purpose of transporting the dog, but that it was used by himself and his family, which amounted to misconduct and constituted a violation of Canon 11 of the canons of professional ethics; that he purchased a washing machine for the sum of $418.01 for the alleged purpose of washing the bed clothing of the dog "Star" which was unreasonable and unnecessary; that purchasing a dog house and fence at a cost of $359.77 was also unreasonable and unnecessary; and that while these charges would not, standing alone, amount to misconduct on the part of respondent, they were evidence of his mishandling of the affairs of the estate.

Count Three involved the conduct of the respondent in permitting and inviting publicity from certain television outlets, and Count Four was in regard to his conduct at hearings before the court commissioner. However, the board of governors found that the evidence in regard to these two counts was insufficient to find the respondent guilty of misconduct.

The board of governors, in its findings, recommended that respondent be suspended from the practice of law for a period of two years.

Respondent is 56 years of age, has been a resident of the community of Tucson, Arizona, for some 36 years, and is married and the father of three grown children. He has had considerable business experience, having acquired and conducted a college book store while attending the University of Arizona. In 1942 he was admitted to the bar, and has practiced law in the city of Tucson ever since that time. During this period he has bought and sold real estate, and to some extent dealt in the buying and selling of automobiles.

Respondent testified that in July 1962 Olivia M. Kuhlmann, now deceased, con-

**216**

sulted him for the purpose of preparing a will, and gave his version of the transaction. She had had considerable disappointment in life, having lost her husband, was disappointed in not having a family of her own, and was not getting along very well with her brother and sister. She stated that her life "had been a very sad and lonely one," and that she had no friends. She expressed her desire to "see that those dogs were adequately cared for." There were no relatives very friendly to her. At that time she had two dogs—one of which died before these proceedings were instituted—and she was anxious to provide for their care after her demise. She had told respondent that she was not in very good health, and that the doctor had told her that she had but a very short time to live. After going over her situation in detail, he prepared a will for her, in which she provided for the care of the dogs; and, on the advice of respondent, she left the residue of her estate to some friends—Sol Rosenbloom, Mayme Mullen, and William Walsh. He called the three friends the "straw men," placed in the will in order to provide for residuary legatees. He said that, in effect, she wanted her property to go for the care of the dogs. She returned to his office a second time for the purpose of making the wording stronger for the care of the dogs.

It was the second will which was admitted for probate. Paragraph seven of the will reads as follows:

"I direct my executor to make necessary arrangements for the permanent care of my two dogs, a Chow champion thoroughbred, about ten years old, and a Weimanier [sic] thoroughbred, about five years old, and I direct that sufficient funds be paid for their care within the discretion of my executor."

This will was dated the 11th of January 1963, and was admitted in probate on February 25, 1963. The estate was appraised at $62,885.03. Respondent, who was named as executor in the will, was appointed to that position, and filed his first account and report on or about the 20th day of June 1963. There were objections filed to the account and report. The court authorized the payment of certain items, adjusted and rejected others, as follows:

| Voucher No. | | Petition Request | Allowed |
|---|---|---|---|
| 6 | 3–26–63—Broadway Animal Hospital, board for dogs | $ 75.00 | $ 75.00 |
| 7 | 7– 4–63—Broadway Animal Hospital, board for dogs | 86.00 | 86.00 |
| 14 | 4– 5–63—Maurine R. Rogers, care of STAR for April | 100.00 | 20.00 |
| 15 | 4– 5–63—Sears, washer | 418.01 | disallowed |
| 17 | 4–14–63—Quebedeaux Pontiac, Station Wagon, trans. | 4,427.68 | withdrawn |
| 18 | 4–18–63—Richard M. Rogers, care of STAR, April | 200.00 | 40.00 |
| 19 | 4–27–63—Paul H. Jones, Inc., insurance for car | 132.60 | withdrawn |
| 22 | 4–30–63—Martin S. Rogers, Trade-in of 1957 Ford | 825.00 | withdrawn |
| 23 | 5–10–63—Mike Putter, dog fence and house | 359.77 | 135.00 |
| 24 | 5–10–63—Richard M. Rogers, care of STAR, May | 300.00 | 60.00 |
| 25 | 6–25–63—Broadway Animal Hospital, vet. care of dog | 22.00 | 22.00 |
| 27 | 6– 5–63—Pima County, dog license | 3.00 | 3.00 |
| 28 | 6–17–63—Richard M. Rogers, care of STAR, June | 300.00 | 60.00 |
| 29 | 7– 2–63—Richard M. Rogers (2nd Account) care of STAR, July, paid $300.00 | 75.30 | 75.30 |
| | Total Allowed Executor for Dog Care | | $ 576.30 |

Respondent contended that the provision of the will directing that sufficient funds be paid for the care of the dogs within the discretion of her executor gave him full authority in the exercise of his discretion to expend the money for the items questioned in his report. He testified in the hearing that Mrs. Kuhlmann, deceased, had told him that she wanted him or his family to care for the dogs, and she wanted the money expended for this purpose. We do not deem it necessary to go into detail in

regard to this testimony. It will suffice to say that the testimony indicates Mrs. Kuhlmann, deceased, being lonely in life, had given her love and affection to these dogs, and that they had in some measure filled a gap by returning affection to her. This is made understandable by the many books and poems which have been written in regard to the faithfulness and devotion of dogs to their masters.

During the course of the hearing on the account and report respondent resigned as executor, and an administrator with will annexed de bonis non of the estate of Olivia M. Kuhlmann was appointed. One of the dogs had died shortly after the death of decedent. The court entered an order giving the care and custody of the remaining dog, "Star," to the Hon. Herbert F. Krucker, judge of the superior court of Pima County, Arizona, and approved expenditures to Judge Krucker in the sum of $5,309.50, which sum included $4,000 for the permanent care of the dog, and $500 for future medical expense for the dog.

Respondent promptly filed an account report setting forth the expenses which he contended were justifiable and within his discretion. We do not deem it necessary to discuss in detail such items as the purchase of the washing machine, the building of the fence and the dog house, and the equipment which was built on the property owned by respondent but occupied by his son. There was a conflict in the testimony in regard to the necessity of these items for the care of the dog. They were submitted to the court in an account and report for approval. The court reduced the amount of the sum requested for allowance for the fence from $359.77 to $135.00, but allowed payment for a fence for the same dog of $190.10 for additional fence, and $33.80 for a dog house to Judge Krucker. So it is evident that the court found that it was desirable to have a fence and a dog house for the care of the dog Star, and in our judgment there was nothing dishonest or in violation of the canons of ethics in the submission of a bill for the expenditure of a sum in excess of what the court, in its judgment, found was necessary.

Counsel for the state bar states a weekly trip to the laundromat would have been sufficient, and the buying of a washing machine and drier was not necessary. This is a matter of opinion. So these items, standing alone, might show lack of propriety, but would not be sufficient to substantiate the charge of violation of the canons of professional ethics for attorneys.

In regard to the matter of the items for the care of the dog, here, again, is a question of fact which had to be determined by the court. The account and report having been filed on the 2nd day of June 1963—a little less than three months after the will was admitted to probate— would indicate that respondent, in good

faith, requested an early approval of the manner in which he was handling the estate.

The more serious charge is in regard to the item of the $825 on trading in the Ford automobile belonging to Martin S. Rogers on a Pontiac, and the buying of the Pontiac Bonneville station wagon at a total cost of $5,277.93 for the care of the dog Star. The local administrative committee initially found the fair market value of the Ford to be $200. This, counsel for the bar points out, was based upon the testimony that the trade-in allowance for the Ford was computed by taking its wholesale value and determining how much of the company's profit could be sacrificed to make the transaction after an appraisal of the value of the 1957 Ford was set at $200, and the company's profit was reduced by $650. There being a conflict in the testimony as to the real value of the car, we feel that we should accept the finding of the bar committee that the value of the automobile was less than the trade-in allowance.

Richard M. Rogers, son of respondent, testified that he had used the 1957 automobile for the care of the dog, taking it to the country in the automobile, and to take the laundry out to be done, and for the purpose of doing shopping for the dog. He then stated, in answer to the question as to whether this automobile seemed to suffice for most of those purposes, that—

"Well, if you want to travel around in an old wreck, I guess it's just fine."

The witness then pointed out, in answer to questions, the reason why he did not consider the 1957 automobile sufficient.

"Q (By Mr. Chandler) Then your objection to the use of that car in the caring for the dog was that it was an old wreck?

"A Well, it was insufficient too, I mean if this is the one I remember, it was no doubt just two doors, and it was—ran like a bomb, I mean it was just—just like it was going to fall apart any minute. And the thing could drool over the seat right onto you, directly onto you.

"Q Wasn't—go ahead.

"A And it would completely—well, it would just get on your nerves and then the dog could jump right over the seat up there with you and I think this did happen one time.

"Q Wasn't this an obedient dog?

"A Yes.

"Q And wouldn't it sit where it was told to sit for as much as minutes at a time?

"A Yes, but often when you'd be going along, the dog was just so affectionate it would start licking you and that sort of thing, and want to get in the front seat and go up to you, before you knew it you'd have it up there."

While the testimony supported the position of the bar that the automobile was not of the value placed upon it by the respondent, it did give some justification for trading it in on the other car—that is, it had been previously used for the care of the dog. The respondent withdrew the request for payment for the Pontiac automobile. We do not have a finding of the court in regard to the need of the automobile. There is testimony, however, that both the washing machine and the dryer were used by the family of respondent for personal use; also that the automobile was used for other purposes than merely transporting the dog—while testimony showed the dog was taken along, respondent used the car to go to court in Bisbee, and it was used for trips to Nogales for a family picnic, and to the Grand Canyon with respondent and his family.

This is unquestionably an unusual will, and for this reason it has attracted unusual attention, for which respondent is not responsible. The provision in the will itself, and particularly the testimony of Carole Brobelch, a neighbor of the deceased, who testified that Mrs. Kuhlmann had told her that she had gone to the respondent, and had no worries concerning the dogs; that she didn't care how much it cost to take care of her dogs the way she wanted them taken care of; and this was the reason she had gone down and had the will made up in the first place, stating:

"A Unless I'm repeating that those dogs were to be taken care of and given the things that they had plus what she couldn't give them because of her age, and this was her main concern were those dogs. This was the reason that she went down and had a Will made up in the first place."

While respondent and his family were not paid for all of the claims presented, they were presented to the court for the purpose of getting them approved. So the question is whether the respondent, in the presentation of these claims to the court and the representations made in regard to the same being necessary for the care of the dog, abused his discretion as to violate the canons of professional ethics governing the practice of attorneys. While request for payment of one of the items might not be sufficient, all of the expenditures presented for approval give a different picture. For example, merely buying a washing machine would not, of itself, be sufficient to find an abuse of discretion, had respondent taken into consideration the value of that use in determining the care to be paid for the dog. Likewise, while the evidence indicated that $300 a month was a high figure for the care of the dog, since that was only for a short period of time before the presentation of the account and report requesting approval of his actions, it would not have been considered so high had the son, who

was caring for the dog, furnished the washing machine and the automobile for transportation for the dog. This would likewise be true in regard to the automobile. Had the son provided the items necessary for the rest of the care at a lower rate because the estate furnished the automobile the picture would have been different.

▇ Here there is a situation in which a woman, because she was very fond of her dogs placed trust in the respondent, and gave him the discretion as to what was needed for their care. The will used the words:

"I direct that sufficient funds be paid for their care within the discretion of my executor."

This shows that she meant only funds "sufficient" for the care of the dogs to be spent—and does not direct that he spend "all" of the money she left for their care. Discretion in the care of beneficiaries under wills has been held not to be arbitrary. In the case of Stallard v. Johnson, 189 Okl. 376, 116 P.2d 965, the court, in speaking of such a discretion, said:

"* * * On the contrary we find that it has been held where the question has been properly submitted that the discretion vested in a trustee must be fairly and reasonably exercised and if not then the same will be compelled by a court of equity. * * *" 116 P.2d at 967

Mrs. Kuhlmann was willing for him to spend all of the money if it were necessary for the care of her dogs, but in her will she did not provide for the expenditure of more than was "sufficient for the care of the dogs."

▇ We agree with the state bar that cumulative acts must be taken into consideration. Where one isolated act may not call for action, several considered together would

"* * * show a course of conduct on the part of respondent incompatible with a proper appreciation by him of that confidential relation which an attorney should maintain toward his client. * *" In re Russell, 57 Ariz, 395, 406, 114 P.2d 241, 245

We agree with respondent that this court is the trier of the ultimate facts. In re Tribble, 94 Ariz. 129, 382 P.2d 237. We also recognize that the evidence of unprofessional conduct of attorneys must be clear and convincing before disciplinary action is taken. In re Lewkowitz, 70 Ariz. 325, 220 P.2d 229; In re Sweeney, 51 Ariz. 9, 73 P.2d 1349; In re Myrland, 43 Ariz. 126, 29 P.2d 483. However, as pointed out by the bar, the recommendations of the board of governors is entitled to serious consideration. In re MacDonald, 56 Ariz. 120, 105 P.2d 1114. We find, from examination of the record, that we cannot condone the actions of the respondent—that they

were not justified—and that they were not a reasonable exercise of his trust as executor. They were such that they justify and call for disciplinary action.

We are of the opinion that respondent should be suspended from the practice of law in this state for a period of sixty days. It is therefore ordered that his right and privilege to practice law in this state be suspended for sixty (60) days, beginning fifteen days after the issuance of the mandate of this court.

STRUCKMEYER, C. J., BERNSTEIN, V. C. J., and UDALL and LOCKWOOD, JJ., concurring.