470 P.2d 441

### In the matter of W. Francis WILSON, a Member of the State Bar of Arizona, Respondent.

### No. 9536.

Supreme Court of Arizona,
In Banc.

June 9, 1970.

Rehearing Denied June 30, 1970.

Evans, Kitchel & Jenckes, by Jos. S. Jenckes, Jr., Phoenix, for respondent.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears by Ralph E. Hunsaker, Phoenix, for State Bar of Arizona.

McFARLAND, Justice:

Formal charges were filed by the Board of Governors against W. Francis Wilson— hereinafter referred to as Respondent— alleging that he had violated the Canons of Professional Ethics of an attorney at law, including Canons 11 and 22; also that he had violated Sec. 32–267, A.R.S.

Consideration of the questions involved by both the Bar and this Court are complicated by the unique situation which developed during and after the hearings on this matter by the Board of Governors and before final presentation to this Court. The charges grew out of the handling of the cases of two of Respondent's clients, Elizabeth Bates Counter and Gladys Porter; but both retracted their original expressions of dissatisfaction with the manner their respective cases were handled by Respondent. However, the original complaints against Respondent, as set forth in the record furnished this Court by the Bar Association, involved ten complaints by Joe Weber, a former business associate of Respondent, eight of which related to the handling of business transactions between himself and Respondent and statements made by Respondent in regard to their business transactions and lawsuits

and in regard to Respondent's own divorce case. The other two involved Weber's part in the handling of the Counter and Porter matters. The Bar Association recommendations were confined to Respondent's handling of the Counter and Porter matters. Weber's testimony was accordingly confined to the handling of these matters.

Both clients not only retracted their expressions of dissatisfaction, stating that their previous representations had grown out of a misunderstanding, but also expressed satisfaction with the manner in which the Respondent had handled their respective cases.

Since the other clients, Counter and Porter, have in effect withdrawn their previous expressions of dissatisfaction with the Respondent's handling of their cases, Weber remains the only complainant who contends that the cases were improperly handled. This will be discussed more in detail under the respective counts. The Bar Association did not have the benefit of the letter and affidavit by Mrs. Counter expressing satisfaction with Respondent's handling of her case, and requesting that the Bar Association's recommendation be withdrawn. These were received after its recommendation had been submitted.

■ We have held that this Court is a trier of the ultimate facts. In re Rogers, 100 Ariz. 214, 412 P.2d 710; In re Tribble, 94 Ariz. 129, 382 P.2d 237. We have also recognized that the recommendations of the Board of Governors of the State Bar Association are entitled to serious consideration. In re Rogers, supra; In re Tribble, supra; In re MacDonald, 56 Ariz. 120, 105 P.2d 1114. This Court, in determining whether the facts justify disbarment, has also held that while disbarment proceedings are not, strictly speaking, criminal in nature they are quasi so. While the allegations that a number of the Bar is guilty of unprofessional practice does not have to be proven beyond a reasonable doubt, the evidence must be clear and convincing to justify the imposition of

such a penalty. In re Lewkowitz, 70 Ariz. 325, 220 P.2d 229; In re Sweeney, 51 Ariz. 9, 73 P.2d 1349; In re Myrland, 43 Ariz. 126, 29 P.2d 483.

The question then is whether under this test it is proven by clear and convincing evidence that the Respondent is guilty of unprofessional conduct. In the instant case, the Board of Governors of the State Bar Association based its recommendations on allegations set forth in two counts.

## COUNT ONE

The Respondent was employed as an attorney prior to 1959 by Elizabeth Bates Counter for the purpose of representing her in the claim against Greyhound Bus Lines. The Respondent and Dick Wilson, not a party to these proceedings, secured a settlement of Mrs. Counter's claim against Greyhound Bus Lines in the sum of $32,500. The Board of Governors contends that the money was paid to Wilson in trust for Mrs. Counter and was thereafter comingled with the Respondent's own assets and funds. It also contends:

"That respondent, without authorization, loaned or contributed the sum of $6,500.-00, a portion of the aforesaid funds, to one Joe Weber who was a business associate of the respondent and engaged with respondent in the development of property in the Harquahala Valley and elsewhere. That said sum of $6,500.00 was invested and used in the development of the aforesaid property and business venture in which respondent had a financial interest."

The Respondent's story in regard to these allegations is that he made the settlement on the personal-injury case against Greyhound in the sum of $32,500, and that after he deducted attorney's fees and costs there was left a balance of $21,564.97 belonging to Mrs. Counter—that Mrs. Counter and his family were life-long friends. He and Richard Wilson both advised her she was liable to lose the money because of a personal problem. Her husband had died shortly after the accident, and she

was keeping company with another man whom she later married, and because of the situation that existed she agreed that the Respondent would keep the money and pay it out to her at the rate of $250 per month—that there were no strings attached to the manner in which he was to handle the money, and that he would have unrestricted use of the funds and the right to invest them. Thereafter he did lend $6,500 of the money to Joe Weber with whom he had business dealings. The evidence shows that Joe Weber testified that the Respondent, upon giving him the $6,500 in response to Weber's request for money, said:

"I don't have any at this moment, but I have some in a client's fund that I can't take, but I can loan it to you and you use it in the business and I will pay it back."

The investigator for the Bar Association recommended that:

"The determination of the dispute between Wilson and Weber as to the circumstances and purposes for the loan from Counter's funds might appropriately be deferred until termination of the current litigation concerning this question."

The court in that litigation found against the accuracy of Weber's version of this transaction, and rendered judgment against Weber. This, in line with the recommendation, eliminates the charge of Joe Weber in regard to the loan.

The question of whether the Respondent violated the code of ethics in handling the money in the Counter matter depends largly upon whether he was handling the money under a debtor-creditor relationship, or as a trustee for Mrs. Counter. This must be determined by the facts as presented. The testimony of both the Respondent and Richard Wilson was that the relationship was that of debtor and creditor. Respondent testified:

"Q Then is it fair to say that what you are describing is not a trustee-beneficiary relationship, but a debtor-creditor relationship between Mrs. Bates and yourself?

"A Yes.

"Q And you then simply were indebted to her for that portion of her share of the settlement which had not previously been expended to her from her account at any moment in time.

"A Yes.

"Q Together with any earnings which might be derived from those funds if they had been placed at interest?

"A True. That's right.

*    *    *    *    *    *

"And Richard and I talked to her on several occasions saying, 'You are going to lose your money.' And she said she was aware of it. And within a few days, why, we ended up with an agreement that I would take care of the money as I saw fit. Specifically, I think that we discussed loaning it to Weber and somebody else that I can't think of and we did not loan it to. And that I was supposed to do with the money as— as I saw fit and make it go as long as possible.

"We especially were stressing it with her that she did not have enough money to last her but a few years."

Richard Wilson testified:

"It finally was settled that the money would be retained, that she would receive so much a month out of this money, and I think it was $250. I am not sure. He (Respondent) would keep the rest of it and take care of it for her as he saw fit. There weren't strings on it, but if it could be invested, it would be invested. If it couldn't be, why, he would keep it. He would do the best with it that he could see to do with it for her benefit. * * *"

The money was lent to Joe Weber, which required a lawsuit to collect. There was collected from Weber $9,663.83, which included interest and attorney's fees. The testimony of the Respondent was that Mrs. Counter had left the State, and that he

did not have her address until a letter came to him from Hawaii. He also states there was a complete settlement between himself and Mrs. Counter at the time that he received the sum of $32,500. After deducting the attorney's fees and costs it left a balance of $21,564.97 belonging to Mrs. Counter, and had she wanted the money she could have had it. He would have been guilty of a violation of Canon 11 and § 32–267, A.R.S., had he refused to deliver the money, but, instead, the agreement was worked out which changed the relationship to that of debtor and creditor. There was a complete accounting to Mrs. Counter after the collection of the money from Joe Weber. The accounting filed by Respondent shows:

| | | |
|---|---|---|
| Paid out to or for the account of Elizabeth Counter | | $25,648.35 |
| Recovery—Bates v. Greyhound | $32,500.00 | |
| Attorney fees and costs | | 10,955.97 |
| Recovery—Bates v. Weber | 9,663.83 | |
| Attorney fees to H. Mallamo | | 1,500.00 |
| Costs | | 58.30 |
| | $42,163.83 | $38,142.62 |
| Balance | | 4,021.21 |
| | | $42,163.83 |

The accounting discloses that at the time Mrs. Counter complained to the State Bar of Arizona there had already been paid to and for her account $25,648.35. The Weber judgment was paid in 1966. The Respondent reimbursed himself for the amount which he had expended out of his personal account in excess of the $21,564.-97, and retained the balance of $4,021.21 for transmittal to her when her whereabouts could be ascertained. He testified that shortly after he learned of Mrs. Counter's whereabouts and on September 17, 1969, his attorney sent to Mrs. Bates [Counter] the sum of $4,373.02.

Elizabeth Bates [Counter] made an affidavit which was filed with the Court as follows:

"ELIZABETH M. BATES, also known as BETTY BATES, being first duly sworn on oath, deposes and says:

"1) I reside at 918 Hikina Lane (Apt. 3), Honolulu, Hawaii 96817, and I left Phoenix, Arizona, in approximately 1962.

"2) In 1959 or 1960 when my case against Greyhound was settled, I voluntarily left my settlement money with W. Francis Wilson, Esq., with instructions to do with it as he saw fit for my own protection; he was to send me the sum of $125.00 on the first and $125.00 on the fifteenth of each month, and to pay additional amounts if in his discretion he thought it advisable.

"3) I left the Blaisdell Hotel in Honolulu in approximately 1964 and did not contact Mr. Wilson thereafter to give him my address or to keep in contact with him; I had earlier been contacted by Mr. Weber to make a complaint against Mr. Wilson but I wanted no part of such a thing.

"4) I have written letters to the Supreme Court of Arizona and to the President of the Bar Association of Arizona which state the complete background of this matter, and those letters and this Affidavit are voluntary on my part.

"5) I have no quarrel with Mr. Wilson and desire that any proceedings against him be dismissed.

(signed) Elizabeth M. Bates

"Subscribed and sworn to before me this 29th day of December, 1969.
(Signed Nancy Y. Okazaki
Notary Public, First Judicial Circuit, State of Hawaii

My commission expires: 9–9–71"

She evidently thought that the letter she wrote to the State Bar Association would assist her in getting money—not result in a complaint against the Respondent. She said in her letter to this Court that Joe Weber contacted her urging her to make charges against Francis Wilson, but that she would have no part of it.[1]

The affidavit and letter were both filed with the Court after the recommendations were made by the Bar Association. The affidavit and the letter corroborate the testimony of the Wilsons. Again we note that the Bar Association did not have the benefit of this affidavit and letter at the time it made the recommendations.

We would not be justified in finding that the evidence was "clear and convincing" in Count I that the Respondent violated the Code of Ethics and § 32–267, A.R.S.

## COUNT TWO

Count II arose out of the handling of a divorce proceeding in which the Respondent represented Mrs. Gladys Porter. The recommendations of the Board of Governors under Count II are based on the following statement set forth in its brief:

"Respondent was employed, prior to 1959, as an attorney by Mrs. Gladys Porter to represent her in connection with separate maintenance and divorce litigation against her husband in Arizona and Idaho. During the involved course of litigation in May 1960, respondent prevailed upon Mrs. Porter to convey to respondent a one-half interest in certain real property and a building known as the Arizona Hotel located in Phoenix, Arizona. That Mrs. Porter understood that such conveyance was to be in trust for the protection of her rights when in fact the conveyance was by quit claim deed to respondent.

"That between November, 1962, and May, 1964, the aforesaid Arizona Hotel was operated under a receivership under the jurisdiction of the Superior Court of the State of Arizona in and for the County of Maricopa. That during said period respondent was attorney both for Mrs. Porter and the receiver and during said period applied

---

1. Supreme Court, State of Arizona, Capitol Bldg., Phoenix, Ariz.

Dec. 26 '69 Honolulu, Hawaii

Dear Sirs:

I have just found out that the State Bar has recommended to the Supreme Court that Francis Wilson be disbarred for what he did to me. I had no idea that my letter written at the suggestion of the legal aid here in Honolulu would cause any such amount of trouble. The Wilsons are an old respected family and my friends, and they don't deserve to be treated like this for anything that Francis did to me.

We agreed that he would keep the money from the Greyhound settlement and handle it as he saw fit, and send me $250 a month—$125 on the 1st and 15th. He was only to send additional money when he believed it to be in my best interest. We quarreled over the phone as to just which was in my best interests. He thought he was protecting me in making my money last longer and he probably was.

I never asked for an accounting until the legal aid suggested it. In 1964 I ran out of money, and was told the suit against Weber was in Supreme Court. I moved from the Hotel where I was living and went to work for one year, then drew unemployment for a year, and when I became 60 years old in May 25, 1967, I was able to start drawing Soc. Sec. disability thru my deceased husband, Clifford Bates.

In the meantime I had been contacted by Joe Weber, to make charges against Francis, but I would have no part of any of it. When Francis found out my address from my son he paid me more money than I had given him.

I want you to withdraw your recommendation to the Court, and leave these people alone. Drop the matter entirely. The newspaper has already gotten everyone talking as though he had done something bad.

Sincerely,
/s/ Elizabeth (Betty) Bates
918 Hickman Lane, Apt. 3
Honolulu, Hawaii 96817

for and received fees as attorney for the said receiver.

"That during the said period respondent, acting as attorney for Mrs. Porter, petitioned the said Court to have the receiver pay to Mrs. Porter the sum of $1,000.00 each month for her support and maintenance and for child support. He intentionally and deliberately deceived and misled the court in representing that these funds were in fact necessary for the support and maintenance of Mrs. Porter and for child support when in truth and in fact it was his intention to appropriate a portion of said funds for his own use. That pursuant to said petition and during the aforesaid period the sum of approximately $22,000.00 was paid by the receiver to respondent on behalf of Mrs. Porter. That respondent diverted approximately one-half of said sum to his own use. That respondent intentionally and deliberately misled and deceived the court in filing periodic accountings for the said funds in that the said accountings represented to the court that the said sums were received and expended for the support and maintenance of Mrs. Porter and for child support. That at various times Mrs. Porter requested an accounting of said funds and respondent failed and refused to provide such an accounting.

"That respondent commingled part of said funds with his own assets and funds." (Findings of Fact and Recommendation, Board of Governors of the State Bar of Arizona, January 4, 1969)

The first part of the allegations of Count II pertain to a quit-claim deed for an undivided one-half interest to W. Francis Wilson and Richard A. Wilson. Mrs. Porter testified that she signed a deed with the intent that it was in trust. The litigation on the Porter matter was long and involved, the history of which may be found in Porter v. Porter, 1 Ariz.App. 363, 403 P.2d 298, vacated, 101 Ariz. 131, 416 P.2d 564; Kemble v. Stanford, 86 Ariz. 392, 347 P.2d

28; Porter v. Stanford, 86 Ariz. 402, 347 P.2d 35, cert. den. 371 U.S. 829, 83 S.Ct. 23, 9 L.Ed.2d 66; and Kemble v. Porter, 88 Ariz. 417, 357 P.2d 155.

Gladys Porter had been referred to W. Francis Wilson by an attorney in Los Angeles, Gerry Giesler, with whom he had done legal work in the State of Arizona and she had come from California to Arizona for the reason that her attorney thought there was tangible property in Arizona from which a separate maintenance award could be collected. Suit was brought, and judgment entered, awarding Gladys Porter a lien on the Arizona Hotel. On July 25, 1959, the trial court entered a judgment determining that the arrearage due under the separate maintenance judgment to be $31,500, and a levy was made to satisfy the judgment. A sheriff's sale was held on August 20, and all of Mr. Porter's interest in the hotel was sold to Gladys who received a sheriff's deed April 7, 1960. The judgment of $31,500, for which the Arizona Hotel was sold at sheriff's sale, included $15,000 attorneys' fees to Respondent and his associate, Richard Wilson. Eleven days after the Arizona separate maintenance judgment was ordered Arnold Porter, husband of Gladys, sued her for divorce in Idaho. She answered, seeking full faith and credit for the Arizona judgment, and participated in the Idaho proceedings. On December 28, 1960—nearly seventeen months after Gladys bought Arnold's interest in the Arizona Hotel at the sheriff's sale and ten months after she obtained the deed thereto—the Idaho court refused to give the Arizona judgment full faith and credit. Furthermore, the court found that the Arizona Hotel was owned by a partnership in which Gladys and Arnold had a community property interest. Arnold Porter was awarded all the community property interest in the hotel, and Gladys was given ten days in which to execute and deliver unto Arnold a transfer and conveyance of all right, title, interest and equity that she had in those properties known as the Arizona Hotel. Pursuant to this order she executed a quit-claim deed

conveying her interest in the hotel to Arnold. However, prior to that date, and about a month after Mrs. Porter received the sheriff's deed, she executed and delivered to Respondent and Richard Wilson a quit-claim deed conveying to them an undivided one-half interest in and to the hotel property. It was this deed that she contended was issued in trust, and so testified at the hearing.

Both W. Francis Wilson and Richard Wilson testified to the contrary—namely, that it was in payment for attorneys' fees which was approximately half the judgment. In this there was a direct conflict in the evidence. The deed did not state that it was issued in trust, but was a quit-claim deed for an undivided one-half interest in the property. According to the testimony of Gladys Porter, while in Idaho in May 1960, at a hearing on the divorce case, she was called to the Wilsons' motel room; that there were present David Doane, the Idaho counsel, Francis and Richard Wilson; and she said that they told her:

"* * * that the way the picture was at the present time, the way the difficulties had come up and how Mr. Porter had transferred his assets and was crying poor mouth and had nothing, and the way his influence was there in Idaho, and even to the extent where they had permitted him to go into my personal safe deposit box and remove the children's bonds and everything, that it would be best for me to transfer my interest in the hotel, and for Mr. Wilson, Francis Wilson to hold in trust, and that for me in the morning to go over with Mr. Doane and have it recorded as a trust deed."

Gladys Porter wrote a letter to Francis and Richard in explanation of a statement she had made in regard to the deed as follows:

"Dear Francis and Richard, .

"Mailing the recent news item that may interest you. No need to tell you of the reaction of my public so in reply to a few close friends who called me I told them that I did not sign a deed of Arizona Hotel to you, but made you a third party to protect my interest from George Kemble and the Porter sisters' actions to obtain the property. Also called David Doane for a better statement when pressed and find out the progress he had made in enforcing that granted to me by Idaho court."

Summing up the evidence, both Francis and Richard Wilson testified that the deed was given in payment of their attorneys' fees. The $32,500 judgment was almost fifty per cent attorneys' fees and fifty per cent for the support of Mrs. Porter and children. It was a quit-claim deed for an undivided one-half interest in the property. Mrs. Porter admitted:

"* * * it appeared to be a quitclaim deed to an undivided half interest in the hotel."

The deed was given during the trial in Idaho with the probability that the court there would not give full faith and credit to the judgment of the Arizona court, under which the property was sold. This evidence would indicate, at the most, a misunderstanding by Mrs. Porter rather than a misrepresentation by the Respondent. She had been, according to her testimony, under tremendous strain. The attorneys were working under a contingent fee and could hardly be blamed for trying to protect themselves in this long litigation. This Court is therefore unable to find that the evidence was "clear and convincing" that the deed was given in trust rather than for the purpose of conveying an undivided one-half interest in the property to the Respondent and Richard Wilson.

The next question presented under Count II was whether the Respondent "intentionally and deliberately deceived and misled the court in representing that these funds were in fact necessary for the support and maintenance of Mrs. Porter and for child support. * * *"; also whether the Respondent mishandled the funds that were paid, and failed to make proper accounting.

The order of the court to which the Board of Governors refers reads as follows:

"UPON READING plaintiff's verified petition,

"IT IS ORDERED that the receiver pay to W. FRANCIS WILSON, as attorney for plaintiff, GLADYS E. PORTER, the sum of Three thousand dollars ($3,000.00) forthwith to apply upon judgment for support and alimony, and

"That the receiver pay to W. FRANCIS WILSON, as attorney for GLADYS E. PORTER, the sum of One thousand dollars ($1,000.00) on the first day of March, 1962, and the sum of One thousand dollars on the first day of each month thereafter until the further order of this Court."

The order was based upon the affidavit of W. Francis Wilson which reads as follows:

"STATE OF ARIZONA ⎱ ss.
County of Maricopa ⎰

W. FRANCIS WILSON, being first duly sworn upon oath deposes and says:

"That he is one of the attorneys for the plaintiff. That heretofore and in the above entitled matter on the 14th day of May, 1959, there was awarded to plaintiff a decree of separate maintenance with a provision for the support of the plaintiff and the minor children of the parties hereto. That notwithstanding the execution sale upon the Arizona Hotel there remains unpaid upon said decree a sum in excess of Nineteen thousand dollars ($19,000.00).

"That heretofore and on or about the 28th day of December, 1960, in the District Court of the Eighth Judicial District of the State of Idaho, in and for the County of Kootenai in Cause No. 18556–A there was awarded to the plaintiff for her support the sum of Twelve hundred dollars ($1200.00 per month and the sum of Two hundred dollars ($200.00) per month for the support of the minor child, TOM CLARK PORTER, together with the sum of Twelve thousand dollars ($12,000.00) for GLADYS PORTER'S attor-

neys fees and that there has accumulated under said judgment in excess of Thirty two thousand dollars ($32,000.00), not one cent of which has been paid.

"That defendant, WILLIAM ARNOLD PORTER is within the jurisdiction of this Court and has failed, neglected and refused to pay anything for the support of the plaintiff or the minor child of the parties hereto, notwithstanding the judgements above referred to.

"That the receiver in cause #55179 has heretofore been odered to pay to GLADYS PORTER for her support the sum of One thousand dollars ($1,000.00) per month. That no amount of money has been paid since on or about the 22nd day of November, 1961.

"That GLADYS PORTER is without funds or other means of support for herself and her minor child.

"Further, affiant saith not.

" s/ W. Francis Wilson
W. FRANCIS WILSON
Attorney for GLADYS PORTER"

Gladys Porter employed independent counsel, Robert Allen, who went over the whole transaction, including the accounting, and compared the items with the cancelled checks, the signatures on the checks, after which, she testified, she discussed the matters contained in the account. After discussing these things she wrote a letter of explanation dated October 6, 1967. The letter was addressed to the State Bar as follows:

"In July 1965 I filed a complaint with the State Bar of Arizona against W. Francis Wilson alleging in substance that he had been dishonest in accounting to me for my money and that he had been guilty of overreaching in securing from me a deed to himself and his nephew for a onehalf interest in the Arizona Hotel.

"In July 1965 it was still doubtful whether the courts would rule that I or my husband owned the Arizona Hotel and it has only recently been resolved, after the

United States Supreme Court denied certiorari, that I owned the hotel.

"Thereafter Mr. Wilson made a detailed accounting to me and to Robert H. Allen (my attorney in this matter since 1965) of the financial affairs between the two of us and further made available to me and to Mr. Allen the cancelled checks and records which were the basis for the accounting.

*"As a result of the accounting made by Mr. Wilson and investigation by myself and Mr. Allen, I have come to the conclusion that Mr. Wilson was not dishonest concerning the financial transactions.* His acquisition, with his nephew Richard, of a one-half interest in the Arizona Hotel, when it is considered as a fee which was totally contingent at the time of the acquisition, is not, in the opinion of Mr. Allen, unreasonable. *Although the charges I made against Mr. Wilson were made in good faith, I believe now that he was mainly guilty in failing to keep me better informed and advised of our relationship. At the same time, I believe Mr. Wilson is to be commended for the stubborn tenacity he displayed through nine years of litigation which will now, apparently, result in the recovery of something for me.*

"Under the circumstances I believe you would be justified in dismissing the charges against Mr. Wilson. I thank you for your trouble and I apologize for the time I have cost you." (emphasis supplied)

While the record shows that Gladys Porter testified that she was under the impression she did not get all of the payments, the record also shows that she went over the accounting very carefully with her attorney—before writing the letter stating that

" * * * As a result of the accounting made by Mr. Wilson and investigation by myself and Mr. Allen I have come to the conclusion that Mr. Wilson was not dishonest concerning the financial transactions; also that his acquisition with

his nephew, Richard, of a one-half interest in the Arizona Hotel when it was considered as a fee which was totally contingent at the time of the acquisition is not, in the opinion of Mr. Allen, unreasonable."

She summed the situation up in her statement in the testimony as follows:

"A It is so much easier now since I have been to Mr. Allen and have discussed everything and he gave me detailed accounting and explained things and now that the courts have finally ruled on all these different—it's so easy to look back, and I admire Mr. Wilson very much for what he has done in some things, and has been willing to answer all of Porter's actions.

"In fact, Mr. Porter has an action against me now for fraud for $800,000, for giving that deed to Mr. Wilson.

"Q In other words, you agree that it took some courage upon Mr. Wilson's part to fight Mr. Porter over the years?

"A Yes, it did.

"Q He [Porter] was a violent man?

"A That is very true."

Gladys was unable to point out any particular item in the account that she had not received. She admitted in her testimony that payments were made to her—for example, in 1960, she admitted that she did get $1,000 checks from the receiver while she was in Spokane. There were other times she admitted getting checks. She was unable to point to any particular item that she did not receive. She testified she was just under the impression she did not get that much money. She said:

" * * * those were rough years and that's why I feel I didn't get those amounts—"

It is understandable that Gladys was unable to remember specific items. There was a long series of lawsuits. Her troubles first started in California. She had a lawyer there who was evidently unable to secure the proper support for her and sent her to Arizona. The Respondent represent-

ed her throughout these years. She had friends suggest to her, as stated in her testimony, that she should be getting regular payments. There was pressure upon her over a protracted long litigation which eventually ended by the denial of certiorari in the United States Supreme Court. She was afraid of her husband, and she testified she leaned heavily upon Francis Wilson in this litigation. The record shows that she had the utmost confidence in him, and in his ability to fight her husband in these lawsuits. The record shows also she was without funds, except as the Respondent was able to secure funds for her from rentals of the hotel. The record shows that part of the time the hotel was running in the red. This strain upon her continued until the time that the lawsuit was eventually settled by the Supreme Court of the United States. She secured her own additional counsel, Mr. Robert Allen, who counselled with her in regard to the situation, and, after going over all of the records, she was satisfied she had made a mistake in making the charges she did against Mr. Wilson's honesty. In regard to the accountancy as to whether the Respondent made proper accounting to her, the record indicates he accounted to her at the different times he received checks. After the final account checked by her and her attorney she said:

"I have come to the conclusion Mr. Wilson was not dishonest concerning the financial transaction."

For this Court to find that the Respondent was guilty of unethical conduct, it would have to ignore the letter that was written and signed by Gladys Porter, which was written with the advice of her own counsel. Under this state of the record we are unable to say the allegations are proven by "clear and convincing" testimony.

The complaint and the testimony of Joe Weber as to the handling of the Porter matter was an allegation that Wilson sold to Weber one-third of Mrs. Porter's interest in a Dallas hotel to finance a lawsuit. However, the recommendation was made by the investigator that

" * * * Since in Mr. Wilson's view he owned one-half of the proceeds of the Porter litigation, it does not appear out of line for him to arrange an agreement to sell a fractional interest in the property to one who would finance litigation necessary to preserve it.

"RECOMMENDATION. The incident does not appear serious enough to merit action by the Bar Committee."

In view of the fact that the Bar Association did not base any recommendations on this transaction, it is not necessary for us to discuss further Weber's testimony in this regard.

Mrs. Porter testified as to many suggestions made to her during the course of the handling of this transaction. These may have added to the pressures she endured in regard to her many lawsuits, but added nothing to the facts supporting the charges.

As we pointed out, the question of the propriety of the Respondent's method of handling the funds in the Counter case turns on the existence of the debtor-creditor relationship. The matter of handling the money thereafter is immaterial to the charge. The record shows that the Respondent did deposit drafts which included money for his own fees in his trustee account, and that he later drew his share out by writing checks both to himself and others. These are not a part of the charges before us, and hence are not material to our holding. We do feel that we must state that the use of a trustee account for personal funds is not proper, and this decision should not be construed as condoning such conduct.

The charges against the Respondent are hereby ordered dismissed.

LOCKWOOD, C. J., STRUCKMEYER, V. C. J., and UDALL and HAYS, JJ., concur.