586 P.2d 194

**In the Matter of a Member of the State Bar of Arizona, Sidney Bernard WEINER, Respondent.**

**No. SB–137.**

Supreme Court of Arizona,
En Banc.

Oct. 25, 1978.

Gust, Rosenfeld, Divelbess & Henderson by James F. Henderson, Phoenix, State Bar Counsel.

Clark L. Derrick and Goldstein, Flynn & Mason, Ltd. by John J. Flynn and Thomas C. Mason, Phoenix, for respondent.

HAYS, Justice.

Respondent Sidney B. Weiner was charged with unethical conduct arising out of his dealings with John E. Dennerline and Mary B. Dennerline. After hearings before a Special Administrative Committee, the Committee made findings and recommended that Weiner be disbarred. The Disciplinary Board adopted the findings of the Administrative Committee, with one minor modification, and also recommended disbarment.

Pursuant to 17A A.R.S. Supreme Court Rules, rule 36, the matter was transmitted to the Supreme Court. Respondent filed objections and an opening brief.

The factual background as viewed by the Administrative Committee and the Disciplinary Board is set out in the findings as follows:

"FINDINGS

"1. At all times relevant hereto Weiner was involved both in the law practice, in providing investment advice to persons who were also his legal clients and in investing both as agent for his clients and for his own account.

"2. He was a stockholder, officer, director, employee and attorney for several business corporations which he used as vehicles for investment for his clients and for his own account.

"3. These corporations had offices adjacent to Weiner's law office and with connecting doors. They had employees common to Weiner in the practice of law.

"4. Mary (Mrs. John) Dennerline received approximately $225,000 from the sale of a family business. She and her husband desired to invest the funds in some enterprises which could provide a greater rate of return than ordinary savings accounts. They consulted with Jack Hilfinger, a private detective who was employed either by Weiner or by one or more corporations controlled by him.

"5. Hilfinger recommended that the Dennerlines talk to Weiner who had knowledge of investment opportunities and was currently involved in a restaurant enterprise called 'Butler's Pantry.'

"6. The Dennerlines made an appointment with Weiner and went to his home where Weiner explained to them the nature of the restaurant venture.

"7. Weiner, Weiner's uncle, and Weiner's client, Murray Cohen, had already made an equity investment in the restaurant venture. Weiner offered to sell to Dennerlines a mortgage on the restaurant property and a five percent stock interest in the corporation for $100,000. They accepted.

"8. Weiner prepared all of the documents necessary to consummate the transaction and a 'closing statement.' The Dennerlines met Weiner in his office for the closing. They said they had certain questions concerning the documents and wanted to consult other counsel. Weiner said that they did not need an attorney, that he would act as their attorney in the transaction and that he would answer any questions they might have.

"9. The Dennerlines relied on Weiner's advice, signed the documents and turned over checks for $100,000 to Weiner.

"10. The relationship of attorney and client existed between Weiner and Cohen as of the date of the transaction.

"11. The relationship of attorney and client existed between Weiner and the Dennerlines as of the date of the transaction.

"12. Weiner permitted the Dennerlines to believe, and they did believe, that the relationship of attorney and client existed.

"13. There existed a fiduciary relationship between Weiner and the Dennerlines.

"14. Weiner's self-interest and the interest of Cohen were inconsistent and in direct conflict with the interests of the Dennerlines.

"15. Weiner failed to disclose the precise nature and extent of these conflicts to the Dennerlines.

"16. Weiner failed to explain to the Dennerlines the speculative nature of the investment, the risks inherent in the transaction and the full significance of the representation by him of conflicting interests, including his own personal interests.

"17. Weiner's failure to make full disclosure to the Dennerlines of the nature and extent of his interest and that of Cohen, the direct conflict of those interests and the interests of the Dennerlines, the risks inherent in the transaction and the full significance to all the parties of Weiner's representing conflicting interests, including his own, violated Canon 6.[*]

"18. Weiner abused and took advantage of the confidence reposed in him by his clients (the Dennerlines) for his personal benefit in violation of Canon 11.

"19. Immediately following the closing of the restaurant transaction, the Dennerlines expressed to Weiner their interest in purchasing some mountain real estate. Weiner advised them that his client Cohen owned some lots in Prescott that might be for sale.

"20. Weiner told the Dennerlines that the price was $50,000 and that it was a fair market price.

"21. At Weiner's direction, Hilfinger showed the property to Dennerlines who decided to purchase it.

"22. Weiner prepared all the documents necessary to consummate the transaction.

* Reference is to Canons of Professional Ethics which were in effect at the time of the alleged violations.

"23. The relationship of attorney and client existed between Weiner and Cohen as of the date of the transaction.

"24. The relationship of attorney and client existed between Weiner and the Dennerlines as of the date of the transaction.

"25. Weiner permitted the Dennerlines to believe, and they did believe, that the relationship of attorney and client existed.

"26. There existed a fiduciary relationship between Weiner and the Dennerlines.

"27. The Dennerlines relied on Weiner's advice, signed the documents and paid the purchase price of $50,000.

"28. Weiner failed to disclose to the Dennerlines the fact that there was a direct conflict of interest between Cohen's interest and the Dennerlines' interest, the risks inherent in the transaction and the full significance to both parties of Weiner's representing conflicting interests.

"29. Weiner's failure to make full disclosure to the Dennerlines of the direct conflict between Cohen's interest and that of the Dennerlines, the risks inherent in the transaction and the full significance to both parties of Weiner's representing conflicting interests, violated Canon 6.

"30. On or about August 6, 1969 Weiner presented to Dennerlines a proposal that they lend to Weiner and Cohen the sum of $75,000 to assist them in purchasing an apartment complex in San Diego. The Dennerlines accepted.

"31. Under the terms of the undertaking the Dennerlines received a promissory note bearing interest at seven percent per annum secured by a collateral assignment of beneficial interest in a land holding trust subject to the liens of two senior mortgages and the right to receive five percent of 'Net cash spendable available funds' from the apartment complex after payment of all debt service, operating, management, promotional and administrative costs.

"32. Weiner prepared all of the documents necessary to consummate the transaction.

"33. The Dennerlines relied on Weiner's advice, signed the documents and turned over checks for $75,000 to Weiner.

"34. The relationship of attorney and client existed between Weiner and Cohen as of the date of the transaction.

"35. The relationship of attorney and client existed between Weiner and the Dennerlines as of the date of the transaction.

"36. Weiner permitted the Dennerlines to believe, and they did believe, that the relationship of attorney and client existed.

"37. There existed a fiduciary relationship between Weiner and the Dennerlines.

"38. Weiner's self-interest and the interest of Cohen were inconsistent and in direct conflict with the interests of the Dennerlines.

"39. Weiner failed to disclose the precise nature and extent of these conflicts to the Dennerlines.

"40. Weiner failed to explain to the Dennerlines the speculative nature of the investment, the risks inherent in the transaction and the full significance of the representation by him of conflicting interests, including his own personal interests.

"41. Weiner's failure to make full disclosure to the Dennerlines of the nature and extent of his interest and that of Cohen, the direct conflict of those interests and the interests of the Dennerlines, the risks inherent in the transaction and the full significance to all the parties of Weiner's representing conflicting interests, including his own, violated Canon 6.

"42. Weiner abused and took advantage of the confidence reposed in him by his clients (the Dennerlines) for his personal benefit in violation of Canon 11.

"43. The Dennerlines did not unreasonably delay filing their written complaint with the State Bar of Arizona.

"44. The State Bar did not unreasonably delay acting upon the complaint.

"45. To the extent that there was delay in acting upon the complaint, it was substantially caused or contributed to by respondent in (1) disqualifying and attempt-

ing to disqualify members of the Administrative Committee and Bar Counsel, and (2) resolving conflicts of professional engagements of respondent's attorney.

"46. Respondent was not substantially prejudiced by delay.

"47. This proceeding is not barred by laches."

Respondent argues that since the transactions in question were fair to the client, no disclosure of his conflicting interests or any other disclosure was necessary. We do not agree.

▮ When an attorney enters into a business transaction with his client, he must not only insure that the transaction is fair, but he must also fully disclose all conflicts inherent in such dealings and all pertinent facts. *Toomey v. Moore*, 213 Or. 422, 325 P.2d 805 (1958); *Cline v. Zappettini*, 131 Cal.App.2d 723, 281 P.2d 35 (1955). The duty to disclose is not obviated by a showing that the outcome of a transaction was fair to the client. Full disclosure of all pertinent information, including the presence of any conflicts of interest, is independently required.

Respondent also argues that even if an attorney-client relationship were created during the first of the three transactions involved, that the relationship did not continue thereafter. He argues that each transaction was independent and that the attorney-client relationship is a transaction-oriented relationship that would normally begin and end with the business at hand. Again, we do not agree.

▮ The attorney-client relationship is an *ongoing* relationship giving rise to a continuing duty to the client unless and until the client clearly understands, or reasonably should understand, that the relationship is no longer to be depended on. *See Alexander v. Russo*, 1 Kan.App.2d 546, 571 P.2d 350 (1977).

Weiner agrees with the broad outline of the facts, but in his testimony, as well as in the briefs filed on his behalf, denies that a lawyer-client relationship existed between himself and the Dennerlines. The briefs of Respondent point to the many discrepancies, contradictions and gaps in the testimony of the Dennerlines. The Administrative Committee and the Disciplinary Board faced, and now this court faces, the difficult task of deciding which of the participants in these events to believe.

This court's role in disciplinary proceedings is well stated in the case *In re Moore*, 110 Ariz. 312, 518 P.2d 562 (1974), as follows:

"In a disciplinary proceeding against an attorney for professional misconduct this Court is guided by certain well defined principles: (1) the evidence of unprofessional conduct by an attorney must be clear and convincing before disciplinary action is taken; (2) the recommendation of the Board of Governors of the State Bar is entitled to serious consideration; (3) this Court is the trier of the ultimate facts as well as law in the case of a charge of unprofessional conduct by a attorney. *In re Rogers*, 100 Ariz. 214, 412 P.2d 710 (1966); *In re Block*, 103 Ariz. 508, 446 P.2d 237 (1968)." 110 Ariz. at 313, 518 P.2d at 563.

In addition to the foregoing, we find that the case boils down to four points:

1. Was there an attorney-client relationship between Weiner and the Dennerlines?;

2. Did Weiner engage in unethical conduct?;

3. Is the evidence on both of the preceding points clear and convincing?; and

4. Is this action barred by the defense of laches?

The first three points require a close examination of the facts. The fourth point involves both facts and law.

From a reading of the reporter's transcripts and an examination of the exhibits, we are convinced that there is evidence to indicate an attorney-client relationship as well as unethical conduct on the part of Weiner. However, we must further determine whether or not that evidence is clear and convincing. *In re Wilson*, 106 Ariz. 34, 470 P.2d 441 (1970).

A study of the authorities leaves one with the impression that "clear and convincing" is a phrase which has not been nailed down with any precision. In fact, *McCormick on Evidence* (2d ed.) § 340(b) at 796 urges that the best definition would be reached if the finder of fact "be persuaded that the truth of the contention is 'highly probable.' "

In *Smith v. Connor*, 87 Ariz. 6, 347 P.2d 568 (1959), the court indicated that most of the issues of fact in the case were disputed by the parties; however, this did not deter the court from finding that the evidence of a trust was clear and convincing. In the same vein is a quotation from 54 Am.Jur., *Trusts* § 621, *cited with approval* in *Murillo v. Hernaillo*, 79 Ariz. 1, 9, 281 P.2d 786, 791 (1955).

■ There is a dispute as to the crucial facts here, but we find the evidentiary position of the Bar "highly probable" and therefore clear and convincing. We find that there was an attorney-client relationship, and we further find that the respondent, Weiner, engaged in unethical conduct in violation of Canons 6 and 11 of the Canons of Professional Ethics (then in effect).

We now address the final issue: Was there laches? The acts of misconduct alleged by the Bar occurred over a period from May, 1969, to the spring of 1970. Thereafter, for a period of approximately four years, the Dennerlines sought from a series of attorneys assistance in resolving the matter. Finally, in late 1974, resort was had to the courts by the opposing parties. After litigation started, the Dennerlines wrote their letter of complaint to the State Bar.

We note that Respondent in his brief concedes that his claim of laches does not rest on any errors or omissions of the State Bar in handling the matter. In fact, many delays were occasioned by Respondent's counsel in challenging both the Committee and assigned Bar counsel, as well as problems in scheduling.

■ Does the waiting of four years by the Dennerlines before complaining to the State Bar void this action? In discussing the cases cited by Bar counsel, Respondent says of *Caldwell v. State Bar*, 13 Cal.3d 488, 119 Cal.Rptr. 217, 531 P.2d 785 (1975), that it stands only for the proposition that lapse of time without specific prejudice is not enough. With this characterization we agree. However, as in the *Caldwell* case, there is no showing here of prejudice to the Respondent. The Respondent urges that he was prejudiced by the fact that Hilfinger, because of a heart condition, was no longer available to testify. This claim of prejudice is obviated by the fact that a statement of Hilfinger, under questioning by Weiner and his attorney, was admitted in evidence over vehement objection of Bar counsel. By reason of this, the Bar counsel was denied any opportunity to cross-examine and test the assertions contained in the statement. The prejudice, if any, was to the Bar's case. We find no laches here which would require dismissal of the action.

It is ordered that Respondent be and he is hereby disbarred.

CAMERON, C. J., STRUCKMEYER, V. C. J., and HOLOHAN and GORDON, JJ., concur.