[Civil No. 4356. Filed June 16, 1941.]

[114 Pac. (2d) 241.]

In the Matter of JOHN E. RUSSELL, a Member of the State Bar.

(No appearance for State Bar.)

Mr. John E. Russell, Respondent, *in propria persona.*

McALISTER, J.—Two complaints against John E. Russell, of Prescott, Arizona, accusing him of unprofessional conduct as a member of the bar of this state, were filed with administrative committee No. 2 of the state bar, the first one in July, 1939, by the Islay Investment, Incorporated, a Michigan corporation, through its president, Donald J. Campbell, of that state, and the second in February, 1940, by the Yavapai Gold and Silver Mining Company, an Arizona corporation, through its president, Thomas Turner, Jr., of Los Angeles, California.

These complaints were heard by the administrative committee and respondent was present and testified; the proceedings were reported by a stenographer and a transcript of his notes is a part of the files. A majority of the committee held respondent guilty of reprehensible and unethical conduct on four of the six charges contained in the two complaints and recommended suspension. A complete record of these proceedings, together with the committee's recom-

mendations, were lodged with the board of governors of the state bar, as required by section 32–335, Arizona Code of 1939, and that body, without taking additional evidence and following respondent's failure to reply to the charges or appear before the board, either in person or by attorney, after being notified of the hearing, sent to this court the complete record with a recommendation of disbarment.

The complaint of the Islay Investment, Incorporated, is in three counts and the substance of the first is that on March 18, 1938, respondent, after having represented to its president, Donald J. Campbell, that he had an interest in twelve mining claims situated in the Hassayampa mining district of Yavapai county, Arizona, and also that he had power of attorney from their owner, George T. Scholey, executed a contract for their sale to the Islay Investment, Incorporated, for $15,000 and accepted a check for $2,500 from the purchaser, $1,113 of which was in payment of the first installment of this contract, when he was not the attorney in fact for Scholey, had no interest in the claims and no authority from Scholey to agree to sell them; that only six of the claims were owned by George T. Scholey, the others being the property of Ed Scholey, of Jerome, Arizona, from whom respondent had no authority whatever to sell; that the execution of the contract of sale was not confirmed or approved by either of the Scholeys and, as a consequence, the Islay Investment, Incorporated, acquired no right to purchase the claims and was defrauded by respondent of $1,113 which he received and still retains.

The allegations of the second count of this complaint are identical with those of the first, except that they refer to the execution by respondent on the same day of a contract for the sale by him to the same purchaser for $19,000 of four claims located also in the Hassayampa

mining district but belonging to one William Giese and to the further fact that the first payment thereon was $1,387. However, no evidence was introduced in support of this count and the administrative committee recommended its dismissal. It is mentioned only in explanation of the check for $2,500 which was given respondent in payment of the first installment under both contracts, that portion of it intended to satisfy the first payment on the Scholey claims being, according to the averments, retained by him.

The first count is based on these facts: On March 18, 1938, George T. Scholey was the owner of twelve mining claims situated in the Hassayampa mining district of Yavapai county, Arizona, known as the Spruce Mountain group, though six of these had been deeded by him to his son Ed to secure exemption from annual labor but were at the same time conveyed back to the father, the deed being placed in the hands of respondent who had been Scholey's attorney for a number of years. Some time in 1935 or 1936 probably the latter, Scholey verbally authorized respondent to handle these claims for him and this authority continued to January 8, 1937, when Scholey made his daughter, Mrs. John R. Franks, of Prescott, his attorney in fact while he was out of the United States, and he left for the Philippine Islands on January 9, 1937, and returned in September, 1939. He was not sure whether he advised respondent of his daughter's appointment but thought he knew it. But whether he did have this knowledge respondent, acting upon his verbal authority to sell the claims for $1,000 each, executed the contract for their sale for $15,000 and accepted the first payment thereon of $1,113. He wrote Scholey on April 8, 1938, that a deal was pending but did not advise him that it had been made, though he testified that he later furnished definite information regarding

it. However, Scholey testified that he knew nothing of the contract with the Islay Investment, Incorporated, until he returned to the United States in September, 1939, and that he received no part of the $1,113. Respondent furnished him a statement of the account between them after this payment had been made, though it does not appear just when, and it showed him still indebted to respondent. The account was not satisfactory to Scholey in that it contained costs of surveying and attorney's fees, for he had not authorized the former and had no knowledge of any attorney's fees being due. According to respondent, the account did not contain attorney's fees only but expenses incurred. He stated that he had carried through the proceedings for Scholey as administrator of the Charley Behm estate from which he later acquired the Spruce Mountain claims, collected money for him and did a lot of things of this kind for him. He was "hard up" and respondent took nothing at the time. Scholey testified that he would have ratified the contract if the $1,113 had been paid to him.

Respondent admits that he had no written authority to execute the contract of sale and that he knew this was necessary before he could give a deed, but states that he acted upon the theory that Scholey would make the deed direct to the purchaser or give him power of attorney to do so, and his reason for assuming this was that he had made four deals on this property prior to that time for Scholey without any writing whatever and in one of these $8,000 of a larger consideration had been paid before the purchaser decided to discontinue payments. The Spruce Mountain claims were part of a larger group and it appears from a letter written by Donald J. Campbell to W. W. Linesba about a month after the contract for their sale was executed, the Islay Investment, Incorporated, decided to repudi-

ate a deal that had been theretofore made by it on the Midnight Test group, and respondent thought its failure to make any movement towards doing the assessment work on the Spruce Mountain group meant that it had decided to repudiate the deal as to it also. In fact the local committee found that the contract for the sale of these twelve claims would have been abandoned regardless of respondent's actions because the principal deal, due to complainant's dissatisfaction with matters concerning it, failed, and that while the contract was terminated because the sellers were not the owners, their title was fully proved.

However, after going into the matter fully, the administrative committee concluded that while respondent had power to negotiate for the sale of the Scholey claims and the right to fix $15,000 as the price therefor, he should not be excused for proceeding with the sale of real property under an oral agency, and that his conduct is subject to censure chiefly because he failed to disclose the facts of the sale to his client and render him an accounting. Scholey did not charge embezzlement, so the committee made no inquiry as to whether there was a balance due him over and above the charges respondent might make against him, but it concluded that the facts called for "disciplinary action." We agree with the conclusion of the committee that respondent's conduct in contracting to sell real property under an oral agency, in failing to report his action promptly and fully to his client and to render him an accounting and reach an understanding before treating the payment on the property as his, was highly improper.

The third count charges in substance that in connection with the execution the contracts of sale described in the first and second counts respondent presented to Donald J. Campbell and requested him to

execute as president of the Islay Investment, Incorporated, an agreement providing that a sum equal to ten per cent. of each payment made under the contracts be paid to him in consideration of services performed and to be performed for the purchaser; that, while purporting to act for and represent the interest of George T. Scholey and William Giese, he sought at the same time to secure from the purchaser a commission on the sale of their properties. The local committee recommended that this charge be dismissed, for the reason that the agreement was not signed on behalf of the purchaser, no commission was paid or became payable thereunder and the evidence left it uncertain whether the commission provided for in the proposed agreement was to be deducted from the payments as made or was an "overriding commission." The fact that Donald J. Campbell did not sign the agreement and no commission became payable under it does not render the conduct of respondent in seeking to secure one from the purchaser any the less unethical. He was representing the owners in these deals and in no position to ask a commission from the purchaser. It is clear that the commission sought was not to be deducted from the payments of the purchase price but was in addition thereto, because the Islay Investment, Incorporated, was making the payments and it was beyond its power to bind the seller to pay its agent ten per cent. of the consideration it was receiving.

The complaint of the Yavapai Gold and Silver Mining Company was also in three counts. The first is that respondent, a practicing attorney at Prescott, Arizona, failed to account to the company for certain monies and property he received as the secretary and treasurer of the corporation. The second charges that he caused to be drawn four checks on the Bank of

Arizona and paid out of the bank account of the company without obtaining the countersignature of another official of the corporation and used the proceeds of these checks for his personal benefit. The third is that he sold for $150 and removed from the claims certain personal property of the corporation without the consent of any of its officials and upon information and belief that this money was used by him for his personal account.

It is alleged specifically and the evidence discloses that in his capacity as an officer of the corporation respondent received money and property belonging to it amounting to $369.30 which was made up of these items: proceeds of a check for $105 paid by the Bank of Arizona on May 20, 1938; proceeds of a check for $75 paid by the same bank on June 28, 1938; proceeds of a check of A. S. Johnson, dated November 25, 1938, for $100; stamps of the value of $73 and stationery of the value of $16.30.

It is also alleged in this count and the evidence shows that respondent drew four checks, totalling $201.30 on the Bank of Arizona in the name of the corporation, cashed the same and received the proceeds thereof as follows: $75 on January 15, 1939; $100 on January 24, 1939; $10 on February 16, 1939, and $16.30 on March 30, 1939.

It appears also that on July 27, 1938, respondent received personal benefit from a check in the amount of $8.95 which was by mistake charged to the corporation's bank account.

The evidence in behalf of complainant corporation discloses that it demanded of respondent an accounting of this money and property, which aggregated $579.55, and that he satisfactorily accounted for $325 thereof but failed to account for the balance of $254.55.

Respondent admitted, both in his response to the order to show cause issued by this court, and in his testimony before the local committee that he received the $579.55 but claimed that all of it, not merely the $325, had been accounted for and used by him for the benefit of the company. The $325 was paid out to girls addressing envelopes in a stock sale campaign and for a watchman at the claims. Respondent furnished the company with a statement which included attorney's fees and expenses of trips to Phoenix and Los Angeles and showed it indebted to him in the sum of $732.77. The company denied these items and one of its officers testified that respondent told him in March, 1938, when they were entering a mail campaign to finance the property, the company owed him nothing but that it had been paying the telephone bill which would take care of the office expenses. He testified further that the company did not authorize respondent to incur thereafter any charges for services or expenses. Whether respondent's explanation of the disposition of this money, or the claim of the company that he had not accounted for $254.55 was correct, it is difficult but, we think, unnecessary to decide. The local committee found that the evidence sustained this charge with the possible exception of attorney's fees and expenses claimed by respondent, the evidence regarding the payment of these not being clear. But even though the company was indebted to him for these two items, it was the opinion of the committee that the diversion of the client's funds in payment of them without a definite agreement that such funds might be so used was reprehensible.

The second count charges that respondent drew or caused to be drawn four checks totaling $201.30 on the company's bank account without obtaining the required countersignature of another official of the cor-

poration and that he used the proceeds of these checks for his own benefit. Respondent admitted that the checks were drawn and that he received the money, but claimed that it was used for corporate purposes and that the checks did have the necessary countersignature. He was unable to say who countersigned them, and when the president and other officers of the company called at his office and asked him to resign as an official of the company and turn over to them all his records he did so, but failed to include among them the canceled checks which he had secured from the bank not many days before. He testified that he thought they were included among the papers he turned over and that he had searched for them but had been unable to find them. The evidence in behalf of the company was that they were not countersigned, and the administrative committee, after hearing the evidencê, found that this was true and this finding is amply supported by the testimony and we accept it as true. To draw and cash a check that is not countersigned by another official of a corporation when this is required as a safeguard against wrongful withdrawal and use of funds on deposit is fraudulent in the highest degree and necessarily constitutes unethical and unprofessional conduct of the same character, and this would be true even though the proceeds of the check should be used for the benefit of the person whose property it was. We think the finding of the committee that this count is amply sustained in the record is fully supported by the evidence.

The last charge is that on April 19, 1939, respondent sold for $150 and caused to be removed from the claims of the company certain machinery, equipment and personal property belonging to it without the consent of any of its officials. This was admitted by him, though he stated that his reason for it was that

Thomas Turner, Sr., had, prior to his death, discussed with W. E. Walde, of Prescott, in his presence, the matter of selling the equipment referred to because it was old and out of date, though Walde testified that he had no recollection of such a conversation. The property sold was a lathe, a drill press and chain blocks, but other equipment was removed to Walde's, a dealer in secondhand machinery, and left on consignment to be sold after consulting with respondent if a buyer could be found. The sale and removal of the property was not reported to the company and it did not learn of it until some time the following August. When asked about it by company officials in Prescott from Los Angeles, he admitted it and promised to return the equipment to the mine and did have all of it, except the lathe, drill press and chain blocks, taken back. Mr. Walde had paid him $150 for these three articles and would not release them until this had been returned. The respondent promised to repay it but had not done so up to the time of the hearing before the committee, which found that the machinery upon which there was a chattel mortgage was sold and removed without authority, that even after respondent had promised to return it he failed to do so, and that consequently this charge was sustained by clear and convincing evidence as well as by respondent's own admission.

An agreement by which the parties attempted to settle the differences arising out of these transactions was signed by them on August 23, 1939, and among other things it stated, as alleged in the complaint and shown in the evidence, that respondent came into possession of $579.55, sold and removed the equipment from the claims, caused all of it to be returned except the lathe, drill press and one 10 horsepower motor and that in the event he should fail to return this property on or before September 6, 1939, he would reimburse

the company for all expenses incurred in the return of the same. According to the record the canceled checks were not delivered and the equipment was not returned. This agreement merely acknowledges the matters mentioned but does not acknowledge the expenses and attorney's fees claimed by respondent but specifically denies owing them.

It occurs to us that it would be unfair to the public to permit an attorney who has been guilty of such unethical conduct as the evidence in this· case discloses to continue the practice of the law. Some of the acts charged, standing alone, might not call for such serious consequences, though at least two of them would, but all of them taken together show a course of conduct on the part of respondent incompatible with a proper appreciation by him of that confidential relation which an attorney should maintain toward his client. The protection of the public, not the punishment of the attorney guilty of unprofessional conduct, is the rule by which the courts are guided in solving the question whether a member of the bar should be allowed to continue the practice and, in this instance, the application of this principle, as we view the facts, denies respondent this right. It is, therefore, the order of the court that he be disbarred from and after July 1, 1941.

LOCKWOOD, C. J., and ROSS, J., concur.