697 P.2d 1084

**In the Matter of a Member of the State Bar of Arizona, Fred T. SCANLAN, Jr., Respondent.**

**No. SB–303.**

Supreme Court of Arizona,
En Banc.

March 26, 1985.

Fish, Duffield, Miller, Young, Adamson & Alfred, P.C. by Richard Duffield, Tucson, for respondent.

Davis, Siegel & Gugino, P.C. by Barry M. Davis, Tucson, for State Bar.

HAYS, Justice.

Respondent Fred T. Scanlan, Jr., is an attorney licensed to practice law in the state of Arizona. On December 8, 1983 a Local Administrative Committee of the State Bar of Arizona (the Committee) found that Scanlan, during his representation of Olson Dairy, Inc., violated several of the disciplinary rules of the Code of Professional Responsibility. 17A A.R.S. Sup.Ct.Rules, Rule 29(a). The Committee recommended that Scanlan be suspended from the practice of law for 90 days and be required to repay the $10,000 taken from Olson Dairy's trust account. It also directed that Scanlan pay the costs and expenses of all disciplinary proceedings.

The Disciplinary Board of the State Bar of Arizona (the Board) agreed with the Committee's findings. A majority of the Board voted to adopt the Committee's recommendations. The Board also called for an audit of all of Scanlan's trust accounts. They recommended that Scanlan be required to employ a certified public accountant to audit the accounts and report the results to them. Scanlan objected to these findings, conclusions and recommendations. We have jurisdiction pursuant to 17A A.R.S.Sup.Ct.Rules, Rule 36(d).

Scanlan raises the following issues for consideration:

(1) Was the recommendation of a 90-day suspension warranted?

(2) Was the recommendation of repayment of the $10,000 warranted and practicable?

(3) Was the recommendation that Scanlan be required to employ a certified public accountant to audit his trust accounts warranted and practicable?

## FACTS

In 1981, Fred T. Scanlan, Jr., was a sole practitioner, living in Tucson, Arizona. In September of that year, Scanlan hired a replacement secretary, Rachel Galvez. Galvez was referred to Scanlan through an employment agency. Scanlan apparently neither checked Galvez's references nor did he contact any of her previous employers. At the time Scanlan hired her, she was under indictment for forgery and theft of funds. She had stolen money from two previous employers.

Galvez's duties for Scanlan became extensive. Among her other activities, Galvez acted as secretary, file clerk, purchasing agent, and bookkeeper. Shortly after she began work, Scanlan made Galvez a signatory on his office "operating expenses" checking account. Generally, however, when Scanlan needed office supplies, he gave Galvez a signed blank check and allowed her to fill in the amount and the name of the payee.

In October of 1981 Scanlan discovered that he needed money. Galvez told him that she had recently sold her home and offered to lend him $10,000. Scanlan accepted the loan and executed a promissory note in her favor. The loan money did not, however, come from the sale of Galvez's home; Galvez stole the money from Scanlan's Olson Dairy trust account. Galvez, explained the circumstances surrounding the loan:

Q. What did he tell you about his financial difficulties?

A. Okay. At that time, it was in reference to a case that was pending on him—or I don't know if it had been filed yet—in reference to Mrs. Armentrout.

Q. Who is Mrs. Armentrout?

A. Apparently, it was a previous client of Mr. Scanlon's [sic].

Q. What did Mr. Scanlon [sic] tell you about the problem with Mrs. Armentrout?

A. Okay. That she had loaned him money, and—or, it was a gift, let's say. It was a gift, in which the lady later came back and was asking for the money back.

Q. Did he tell you any more about that situation?

A. Just the fact that they were going to file charges against him if he didn't pay that money within a certain period of time.

Q. Did he ask you if you had any money to loan him?

A. No. I had offered it myself.

Q. How much money did you offer to loan him?

A. Okay. At that time, it was $10,000.

Q. Did you have $10,000 of your own funds at that point to loan Mr. Scanlon [sic]?

A. At that time, no. That's when I first made that first check from the Olson Dairy.

In late 1981 or early 1982 Scanlan discovered that Galvez had been stealing money from his operating account. Apparently a creditor called Scanlan and demanded payment of an overdue bill. Scanlan explained that he had already paid the bill. The creditor insisted that Scanlan had not paid. Scanlan then realized that Galvez had stolen money from his operating account. He was still unaware of the thefts from the Olson Dairy account.

When Scanlan confronted Galvez, she admitted stealing money from the operating account. Scanlan determined that $3,784 had been taken from his operating account. He did not audit his other accounts. Scanlan told Galvez that if she would make restitution he would not fire her. Scanlan did not report the theft to the police, nor did he significantly change any of his office procedures. For a time Galvez continued to be a signatory on Scanlan's operating account.

MS. WEZELMAN: So after you knew she had been embezzling, you didn't really keep a closer eye on your operating account even?

THE WITNESS: Yes, I did. I started—I started reconciling the checkbook in—with February.

THE CHAIRMAN: But that's two months after you found out, or at least a month after you found out that Rachel had taken the money.

THE WITNESS: Yes.

THE CHAIRMAN: What about that month or two in between? Why didn't you at that point take over the account, take it out of her hands, even if you had forgiven her?

THE WITNESS: I guess because I felt that if I really had forgiven her, I would continue to trust her, and in the press of business, I just didn't do it.

Galvez repaid the $3,784. She wrote herself a check for $3,784 on the Olson Dairy account, signed it, and presented it to the bank for deposit in Scanlan's operating account. Galvez then gave Scanlan the deposit receipt to prove that she made restitution. Scanlan did not question the source of her funds.

From October through December of 1981 Galvez wrote five checks on the Olson Dairy account totalling over $15,000. One of these checks was the source of Scanlan's $10,000 "loan." One check for $900 was deposited in Scanlan's operating account, presumably to cover shortages. All of these checks bore Scanlan's signature. Scanlan cannot confirm or deny whether these signatures were forged. Galvez testified, however, that Scanlan did not know that he was signing any of these Olson Dairy checks. She stated that she obtained his signature by falsely representing that the checks he signed were to be drawn on the operating account and needed for the purchase of office supplies. She obtained these blank checks even though she was a signatory on the operating account:

Q. You just indicated that you were able to sign checks yourself on the operating account?

A. Right.

. . . .

Q. Why would you have to have, then Mr. Scanlon [sic] sign checks in blank?

A. I don't know. At times he would. I really don't know.

Scanlan did knowingly sign an Olson Dairy check dated February 3, 1982. Scanlan intended the check to pay Olson Dairy's unemployment insurance. Scanlan signed the check and instructed Galvez to fill in

the amount and the name of the payee. Galvez wrote the check for $7,000 and put her own name as payee. She used the funds to make restitution to a former employer from whom she had also embezzled money.

From February 23, 1982 until March 29, 1982, after Scanlan was aware of Galvez's thefts from his operating account, Galvez wrote five more checks on the Olson Dairy account. These checks totaled slightly more than $7,000. Although Galvez was not a signatory on the Olson Dairy account, she signed her own name as payor and the bank honored these checks. One of these checks was the source of Galvez's $3,784 reimbursement to Scanlan for the thefts from his operating account.

In March of 1982, Olson Dairy declared bankruptcy. The receiver in these proceedings was George J. Itule. Itule called Scanlan's office and spoke to Galvez. He requested payment of the amounts held in trust. Despite repeated visits and demands to Galvez, Itule was unable to obtain the money. Scanlan was unaware of these contacts. Itule's attorney, Joe McDonald, made direct contact with Scanlan. McDonald told Scanlan that he wanted the Olson Dairy money. Scanlan directed Galvez to write a check for $26,117.43. Shortly after McDonald left with this check, Galvez wrote a second check. This check was in the amount of $18,587.99 and was drawn on Scanlan's general clients' trust account. Galvez was a signatory on this account, and she intended this check to make up for the shortages in the Olson Dairy account.

Galvez's efforts to hide her thefts were unsuccessful because Scanlan's bank refused payment of the Olson Dairy check. McDonald then obtained an Order to Show Cause and had it served on Scanlan. This was Scanlan's first knowledge of shortages in the Olson Dairy account. After reconciling his bank statements, he discovered that Galvez had stolen more than $30,000. Scanlan reported these thefts to the police. Galvez is currently in jail.

Olson Dairy's receiver in bankruptcy, Itule, sued Scanlan and his bank. This lawsuit was eventually settled. The shortages in the Olson Dairy account were paid off by Scanlan's malpractice insurer ($22,-880.23) and by Scanlan's bank ($7,302.93). Scanlan's bank contributed to this settlement because it erroneously honored the five Olson Dairy checks signed only by Galvez.

## SUSPENSION

Both the Committee and the Board recommended that Scanlan be suspended from the practice of law for 90 days. This recommendation was based on the finding that Scanlan, during his representation of Olson Dairy, violated various disciplinary rules: DR 9–102(B)(3) (maintaining complete records and rendering appropriate accounts); DR 1–102(A)(6) (engaging in conduct adversely reflecting fitness to practice law). They also found that Scanlan violated the rules and guidelines concerning trust account verification. 17A A.R.S.Sup. Ct.Rules, Rule 29(f)(1) and 29(f)(5).

Scanlan contends that a 90-day suspension is unwarranted. He argues that almost all attorneys would have found themselves in a similar situation had they hired Rachel Galvez. He maintains that suspension is punishment "for being duped by Rachel." We disagree.

The 90-day suspension is warranted not because Scanlan was a victim of Galvez, but because Scanlan failed to exercise even minimal care over his various trust accounts. Had Scanlan checked with Galvez's prior employers, most likely the thefts would not have occurred. Had Scanlan dismissed her after discovering the thefts from his operating account, the decimation of the Olson Dairy account would not have been complete. Even after Scanlan discovered this theft, he did not question the source of his $10,000 loan or the $3,784 reimbursement. He did not audit any of his other accounts, nor did he take adequate precautions to put them beyond Galvez's reach. While we do not set out the entire Committee's findings, suffice it

**338**

to say that these acts and omissions constituted gross negligence and violated the disciplinary rules governing trust accounts. We note that Scanlan once before had been censured for his activities. We agree with the recommendation of the Committee and the Board and order that Scanlan be suspended from the practice of law for 90 days.

## REPAYMENT

█ The Committee and the Board also recommended that Scanlan be required to repay the $10,000 "loan" derived from the Olson Dairy account. Scanlan contends that this recommendation is unwarranted. He points out that his malpractice insurer and his bank have fully reimbursed Olson Dairy. Scanlan asserts that repayment should not be required because he neither knew that the money came from Olson Dairy, nor was he a wrongdoer for merely borrowing money from his secretary. Scanlan further maintains that although he benefited from the loan, the end result of his employment of Rachel has resulted in harm to him far greater than any benefit he derived from the loan.

The evidence does not suggest that Scanlan was aware of the source of his loan. Were he aware, disbarment would be indicated. Although we question the propriety of an attorney borrowing money from his secretary, this conduct does not warrant repayment. Most important, Olson Dairy, by and through its trustee, has been fully reimbursed. To require a second repayment is unwarranted.

The $10,000 was actually stolen by Galvez. The check came from among those Olson Dairy checks that Galvez misrepresented as operating account checks. Scanlan thought he was buying office supplies. Scanlan's malpractice insurer eventually repaid the amounts represented by the five checks Galvez obtained in this manner.

█ We do not believe it is appropriate to now order Scanlan to make repayment to his malpractice insurer. Scanlan, presumably, paid for the coverage it provided. The insurer may pursue any claims it has against Scanlan or Galvez without prejudice.

## AUDIT

█ The Board recommended that Scanlan be required to employ a certified public accountant, at his own expenses, to conduct an audit of all his trust accounts pursuant to 17A A.R.S.Sup.Ct.Rules, Rule 29(f)(4). The Board directed that the findings of this audit be filed with them. Scanlan contends that there is no evidence in the record to suggest that there is any problem with his other trust accounts. We disagree.

MS. WEZELMAN: At some point after this, did you do an audit of all your trust accounts?

THE WITNESS: Yes.

MS. WEZELMAN: Were there any other discrepancies?

THE WITNESS: Yes. There were other shortages in the clients' trust account. I put—she put money into my client's trust account to cover up the shortages.

MS. WEZELMAN: What is a general figure for the amount of the shortages you discovered?

THE WITNESS: I would say that it's $1,500 to $1,800.

MS. WEZELMAN: Were these also attributable to withdrawals and deposits by Rachel?

THE WITNESS: By Rachel, yes.

MS. WEZELMAN: Did she have authority to be a signatory on those accounts?

THE WITNESS: Yes, she did.

The Board's recommendation is amply supported by the evidence and is warranted.

█ Pursuant to 17A A.R.S.Sup.Ct. Rules, Rule 37(g), we direct that Scanlan pay the costs and expenses incurred in proceeding against him, $3,451.85.

HOLOHAN, C.J., GORDON, V.C.J., and CAMERON, J., concur.

Note: STANLEY G. FELDMAN, Justice, did not participate in the determination of this matter.