764 P.2d 1

**In the Matter of a Member of the State Bar of Arizona, Randall Ray DOUGLAS, Respondent.**

No. SB–87–0037–D.

Supreme Court of Arizona, En Banc.

Oct. 4, 1988.

Crowe & Scott, P.A. by Michael B. Scott, Phoenix, for respondent.

Gallagher & Kennedy by E. Calvin Fuchs, Phoenix, for State Bar.

CAMERON, Justice.

## I. JURISDICTION

The Bar Disciplinary Commission recommends that the Respondent, Randall R. Douglas, be suspended from the practice of the law for six months. Because the conduct in question occurred prior to the adoption of the Rules of Professional Conduct, Rule 42, Rules of the Supreme Court, 17A A.R.S. effective 7 September 1984, the matter was considered under the Code of Professional Responsibility. *See* former Rule 29(a), Rules of the Supreme Court 1987 Supplemental Pamphlet to Vol. 17A A.R.S., page 438, *et seq.* We have jurisdiction pursuant to Ariz.R.S.Ct. 46 and 53(e), 17A A.R.S.

## II. QUESTIONS

Respondent raises two questions.

1. Did respondent violate the Code of Professional Responsibility?
2. If so, was the sanction excessive?

In addition the Bar Counsel raises two questions.

3. Was the Committee correct in dismissing count four?
4. Could the Respondent have been required to make restitution to the Client Security Fund?

### III. PROCEDURAL FACTS

Respondent was accused of ten counts of professional misconduct. After five days of hearings over a six month period, the Hearing Committee dismissed four counts and found Respondent in violation of six counts of the Code of Professional Responsibility. The Hearing Committee recommended that the Respondent be suspended for seven months.

The Bar Disciplinary Commission adopted the Committee's findings and conclusion of law but rejected the Committee's recommendations for a seven month suspension and reduced the suspension to six months. The Commission also rejected the recommendation of the Committee that Respondent make restitution to the Client Security Fund. Both Respondent and Bar Counsel objected to the Commission's report.

We note that in reviewing the records of Bar disciplinary actions we are both a trier of law and ultimate fact, *In re Mercer*, 133 Ariz. 391, 393, 652 P.2d 130, 132–33 (1982). Also in order to find misconduct the evidence must be clear and convincing. *In re Rogers*, 100 Ariz. 214, 221, 412 P.2d 710, 715 (1966).

### IV. WAS THE RESPONDENT GUILTY OF PROFESSIONAL MISCONDUCT?

### A. COUNT ONE

Respondent was appointed personal representative of the Estate of Judith E. Weil on 30 January 1981. As part of his duties as personal representative, he was required to file tax returns on behalf of the estate. The returns were due in September, 1981.

Respondent testified before the Hearing Committee that he prepared a request for extension of time to file the federal estate tax return in September, 1981. He stated that he did not know whether the extension was lost in his office or in the mail.

MR. FUCHS: Did you request an extension at that time?

MR. DOUGLAS: I prepared a request for an extension; it was not filed.

\*     \*     \*     \*     \*     \*

MR. FUCHS: Have you ever seen the request for extension at any time after you prepared it?

MR. DOUGLAS: .... what I did, Mr. Fuchs, I Xeroxed off the form from IRS. I filled it in by hand. My secretary then typed in the form. I signed the form. I left it to be mailed. From the time I left it in my out box, that was right before I went in the hospital for surgery, and when I came back it wasn't in my box anymore. I never saw it after that, no, sir.

Respondent's secretary, stated that she had no recollection of either typing or mailing the request for extension.

Respondent's testimony is contrary to a letter to the Internal Revenue Service. In the letter, Respondent claimed the returns were not filed because of difficulties in dissolving two personal holding companies, the complexity of the estate, and "unavoidable personal problems suffered by the personal representative," including litigation in Grand Rapids, Michigan, bacterial dysentery, and knee and hip surgery in September, 1981.

Respondent also wrote Attorney Edwin V. Matney a letter in which Respondent recognized that the estate tax return was due on 20 September 1981. Mr. Douglas explained that he was hospitalized for surgery on that date. He also stated: "Because I could not be sure when the estate could be closed, and what the final values would be, no extension was filed."

As a result of Respondent's inaction, the Estate of Judith E. Weil was subjected to substantial interest and penalties by federal and state taxing authorities, as follows:

|  | Federal | State |
|---|---|---|
| Interest | $18,391.45 | $1,163.21 |
| Penalties | 20,325.38 | 1,457.25 |
| TOTAL | $38,716.83 | $2,620.46 |

The Committee found that Respondent's conduct violated DR 6–101(A)(2), handling a matter without adequate preparation and DR 6–101(A)(3), neglect of client's legal matter.

We believe the allegations contained in count one are supported by clear and convincing evidence and that the Respondent violated the cited sections of the Code of Professional Responsibility. We note that Respondent's malpractice carrier reimbursed Respondent's clients so they suffered no loss. Had it not been for this insurance, the client could have suffered considerable loss. Respondent's negligence is inexcusable and his lack of candor unacceptable for an attorney. *See People v. Stewart,* 752 P.2d 528 (Colo.1987).

## B. COUNT THREE

█ Respondent was charged with several instances of double billings regarding the sale of a home from the Estate of Judith E. Weil.

According to Respondent, he had an agreement with the heirs of the Estate of Judith E. Weil that in lieu of charging the Estate hourly fees for his efforts in selling the deceased's patio home, he would simply charge a commission of five percent of the sales price.

The evidence indicated that Respondent did collect a "commission" of $5,650 on the sale of the house. He also charged and collected hourly fees from the Estate relating to the sale of the patio home. Respondent testified:

MR. FUCHS: Did you ever apprise the heirs that you had taken a five percent commission on the sale of their mother's patio home?

MR. DOUGLAS: Yes, sir, I did.

MR. FUCHS: When did you do that?

MR. DOUGLAS: When the property sold.

\* \* \* \* \* \*

MR. FUCHS: Is it your testimony that this agreement was entered into by the heirs as compared to Judith Weil?

MR. DOUGLAS: Yes, sir.

MR. FUCHS: And you've already testified with the Committee today that there had been some double billing pertaining to the sale of the real estate?

MR. DOUGLAS: Yes, sir, there was.

MR. FUCHS: And you believe that it was in the neighborhood of five to seven hours?

MR. DOUGLAS: I think that's what's reflected, yes.

Rick Weil, one of the heirs, testified there was no agreement for a commission on the sale of the house.

Respondent claims the double billing was the result of a "clerical error." This allegation was rejected by the Hearing Committee and the Commission. Both found Respondent violated DR 1–102(A)(4), fraud, deceit or misrepresentation, DR 2–106(A), excessive fees, DR 5–101(A), conflict of interest, and DR 6–101(A)(2), handling a matter without adequate preparation.

There is no prohibition against an attorney charging a commission for the sale of a client's property as long as there is a clear agreement for such with the client. Our statute provides that an attorney at law is exempt from the requirement that a person must be a licensed real estate broker or salesperson before a commission may be received for the sale of real property. A.R.S. § 32–2121(A)(3). In construing a similar statute the Maryland Court of Appeals has stated:

Thus, § 212(f)(6) establishes that an attorney who is not regularly engaged in the real estate business and who does not offer to provide real estate services to the general public, may, for a commission, perform certain acts associated with the sale and use of real estate without being licensed as a real estate broker.

*Atlantic Richfield Co. v. Sybert,* 295 Md. 347, 363, 456 A.2d 20, 28 (1983). Clearly an attorney may not, however, obtain a commission and charge hourly legal fees for the same sale.

We agree with the Committee and the Commission that the Respondent violated the stated disciplinary rules.

## C. COUNT FIVE

Respondent testified that he reached an agreement with Mrs. Weil prior to her death where he would charge her $125 an hour for the work he did on her estate. This fee agreement was never put into writing.

Respondent testified that he charged the estate approximately $35,000. In the Amended Accounting filed in the probate matter, verified by the Respondent, he represented that he received a personal representative fee of $30,235 plus a real estate commission in the sum of $5,650. The client ledger for the estate shows Respondent logged 197.4 hours on the matter. Even without subtracting the double billed hours relating to the sale of the patio home, it appears Respondent charged a fee in excess of that allegedly agreed to by Mrs. Weil. ($30,235 divided by 197.4 hours = $153.17 per hour.)

Before the committee, Mr. Crehore, a partner in the law firm of Lewis and Roca who had handled over one thousand estates, testified that the fees charged the estate by Respondent were "grossly excessive."

MR. FUCHS: Mr. Crehore, why did you term Mr. Douglas' fees as "grossly excessive" in that letter?

MR. CREHORE: It seemed to me that the estate of the decedent, which was subject to the probate proceeding, was somewhat less than $100,000 in total amount, that of the $100,000 there didn't seem to be anything that was reflected in the estate that should cause any great difficulty in handling and administering it and transmitting it on to the heirs. As I recall, the fees that were shown in the accounting, that Mr. Douglas either had charged or proposed to charge, amounted to some $28,000, plus or minus; I don't recall the figure exactly. The work that would have needed to have been done for an estate of that size, to me would have required, at the most, 20 or 25 hours of time, and maybe an expenditure of a couple of thousand or $2500 of attorney's fees. One of the other problems that I had with it was that at some point early on, and I can't tell you when, I learned that the Federal and Arizona State tax returns had not been filed. I believe that those were subsequently filed. Normally, I would feel that the preparation and filing of a Federal or State tax return would be something that would generate an additional fee, depending upon the amount of work that had to be done, a minimum of at least $650 or $750 to perhaps maybe $1500. Again, it did not seem that the estate tax return for this estate was unduly complicated or difficult, because it appeared that the greater part of the assets of this estate were for tax purposes, as opposed to probate purposes—were being held by the bank in a separate trust. It did not appear to me that under those circumstances, a fee of somewhat in the area of $28,000 was anything but, as I've put it in my letter, I believe grossly exorbitant; I said "grossly excessive", reading my letter. That was my opinion at the time; [it] remains my opinion.

Mr. Crehore also testified as to the time spent on the estate:

MS. SWAN: When you said 20 to 25 hours was your estimate of the amount of time that would be required, what services were you taking about?

MR. CREHORE: I am looking at an estate that, insofar as its assets, had $98,000 in value of property. A portion of it were checking accounts or a note receivable; a portion of it was a house and lot that had a value of $56,500; and the rest of it was miscellaneous property including an automobile and things of that kind. That is simply not a difficult estate to administer. It shouldn't take any real amount of time to administer and to distribute an estate consisting of those few assets and that value. Now, don't misunderstand me, value is not always the key. You can have a $98,000 estate that will take you forever because it's a hodgepodge and badly mixed up, and you can have a $98 million estate that's clean. This estate, based on the accounting of Mr. Douglas from that standpoint—from a probate purpose—appeared to me to be clean.

The Committee and the Commission found the Respondent violated DR 2–106(A), excessive fees. We agree.

## D. COUNT SIX

In 1982, Respondent caused to be published in the Metro Phoenix Consumer Yellow Pages an advertisement listing "Estate Conservation" as a specialty. The file indicates that Respondent had handled no more than "a half dozen" estates. Estate conservation has never been recognized as an area of specialty by the Arizona Board of Legal Specialization. The Hearing Committee and Disciplinary Commission found Respondent's conduct to be a "technical violation" of DR 2–105(A)(3), which reads:

A lawyer specializing in a particular field of law or law practice may hold himself out as such specialist but only in accordance with the rules as prescribed by the Arizona Board of Legal Specialization.

We believe this is more than a "technical violation." An attorney who without additional training and only six estate cases to his credit is hardly a specialist in "Estate Conservation." We believe this is a violation of DR 2–101(A) which reads:

A lawyer shall not, on behalf of himself, his partner, associate or any other lawyer affiliated with him or his firm, use or participate in the use of any form of public communication containing a false, fraudulent, misleading, deceptive, self-laudatory or unfair statement or claim.

Not only did Respondent profess to be a specialist in a specialty not recognized by the Arizona Board of Legal Specialization, but even if there were such a speciality, Respondent would not have qualified. We believe Respondent violated DR 2–101(A).

## E. COUNT SEVEN

Respondent was retained by George Wendelken to represent him in a professional malpractice and breach of contract claim against Oliver/Pilcher Insurance, Inc. and one of its agents, Stewart White.

On 17 February 1983, the attorney for the defendant, Richard K. Mahrle, filed a motion for summary judgment in the action. The Honorable J.D. Howe issued a minute entry on the following day which provided in pertinent part:

All memoranda and affidavits regarding the motion must be filed and copies lodged with this Division no later than four (4) Court days prior to the date set for hearing.

Counsel are advised that if the answering memorandum is not timely filed in accordance with the Uniform Rules of Practice of the Superior Court, oral argument may be vacated and the motion will be ruled upon in accordance with Rule IV of the Uniform Rules of Practice.

Respondent did not file a response to the motion for summary judgment. Judge Howe issued a minute entry on 17 March 1983, stating:

Defendant's Motion for Summary Judgment having been submitted to the Court on Motions and Memoranda pursuant to U.R.P.S.C.A. IV(b), there having been no response, and good cause appearing,

IT IS ORDERED granting Defendant's Motion for Summary Judgment.

Mr. Mahrle is requested to prepare an appropriate form of Judgment for lodging with the Court.

IT IS FURTHER ORDERED vacating hearing on said Motion set for March 17, 1983. . . .

The same day the minute entry was issued (17 March), Respondent wrote a letter to Mr. Mahrle, stating: "As I told you, a response to your motion was filed on Monday, March 14, 1983. Obviously, Judge Howe [will] have to reconsider his ruling."

According to the testimony of the Respondent, when he arrived at his office on the morning of 17 March 1983, he discovered that oral argument on the motion for summary judgment had been cancelled. Respondent claims he promptly telephoned the judge's secretary and learned that the Court had granted summary judgment against Mr. Wendelken because no response had been filed. Respondent then wrote the letter to Mr. Mahrle representing that a response had been filed.

The Committee and the Commission found the Respondent violated DR 1–102(A)(5), conduct prejudicial to the administration of justice, and DR 1–102(A)(6), fitness to practice law. We agree. We are most concerned, however, with Respondent's lack of candor to another attorney that a response had been filed when in fact this had not been done. This is not acceptable conduct for an attorney and violated the DR as indicated.

## F. COUNT NINE

Count nine concerns two contempt citations against Respondent as a result of the break-up of Respondent's law partnership with David Gustafson.

On 18 June 1984, David Gustafson filed a complaint requesting, among other things, a partnership accounting and dissolution. Respondent filed a similar complaint on 22 June 1984. These Actions were consolidated under Cause No. 516670.

### 1. *First Contempt Citation*

In July 1984, Respondent negotiated a $500,000 settlement on behalf of clients of the partnership. Mr. Gustafson's attorney, in the partnership dissolution action, filed a motion for temporary restraining order to prohibit Respondent from disbursing any portion of the settlement proceeds that constituted fees or costs.

On 12 July 1984, the Honorable Edward C. Voss heard the motion for temporary restraining order. At the hearing, counsel for the respective parties stipulated that forty percent of the settlement check would be deposited "forthwith" either with the Clerk of the Superior Court of Maricopa County or into an interest-bearing account mutually agreeable to the parties. The motion for temporary restraining order was withdrawn.

Following the settlement, Respondent flew to Colorado to have the client endorse the settlement draft. Respondent negotiated the settlement draft and had a cashier's check issued to his client. Of the remaining $200,000, a check for $100,000 was issued to an associate in his office, and $100,000 was deposited to a bank account in Colorado.

Respondent flew back to Phoenix, delivered the $100,000 check to his associate, then telephoned his lawyer in the partnership dissolution action, Mike Parham. They discussed Judge Voss' order made that morning. Respondent testified that it was his belief that he was required to retain forty percent of *his* portion of the fee only ($40,000), not forty percent of the entire fee ($80,000).

Respondent's check register for the Colorado bank account reveals he wrote a $10,000 check to his professional corporation business account on 17 July 1984. On the same day, he made a personal withdrawal of $20,000. On 19 July 1984, Respondent wrote another $10,000 check to his professional corporation.

On 23 July 1984, Respondent's counsel filed a motion for clarification of order. In the motion, Respondent's counsel requested "that the July 12, 1984, minute entry be clarified to require only 40% of the remaining half of the legal fees ... (that half remaining after payment to Mr. Stachon) be impounded."

While the motion for clarification was pending, Respondent withdrew another $20,000 from the Colorado bank account, leaving a balance slightly in excess of $40,000. Respondent claims he did so upon advice of his counsel. Mr. Parham unequivocally denied, however, that he ever advised Respondent it was permissible to withdraw money from the Colorado account before the motion for clarification had been ruled upon by the Court.

Judge O'Toole entered another order on 28 September 1984, requiring Respondent to deposit $80,000, plus interest thereon from 12 July 1984, in an interest-bearing account no later than noon on 10 October 1984. Respondent did not comply with this order.

Judge O'Toole heard the motion to quash on 6 November 1984 and denied the Respondent's motion to quash.

The hearing on the order to show cause regarding the alleged contempt was com-

menced on 9 November 1984. Respondent had placed $40,000 plus interest in the interest-bearing account, but claimed that he could not raise the remaining $40,000 in order to comply with the Court's order. Judge O'Toole ordered the Respondent to submit a sworn financial affidavit to the Court, demonstrating his inability to pay.

Respondent then made an offer to compromise and purge the alleged contempt on 14 November 1984. Judge O'Toole conducted a hearing on the same date and extended the time for Respondent to file his financial affidavit.

On 20 November 1984, a new deadline for submitting the financial affidavit was established at Respondent's request. Mr. Douglas failed to file the financial affidavit.

The contempt hearing was resumed on 21 November 1984. After a hearing, Respondent was held in contempt of court by Judge O'Toole.

### 2. Second Contempt Citation

On 17 September 1984, Judge O'Toole issued a minute entry which stated, in pertinent part:

> The court further directs that the plaintiff and defendant, and their respective counsel, provide and continue to promptly provide and disclose to each other all financial activities ... on all cases specified in the stipulation on the OSC dated 9/14/84. Such financial activities subject to disclosure includes and is not limited to payment in receipt of fees, expenses, settlements, etc. concerning these accounts.

On 18 January 1985, Gustafson filed another petition for order to show cause regarding an alleged contempt for violation of the order of 17 September 1984, requiring prompt notification of financial activity on cases. A hearing was held one week later. The Court made a determination that Respondent willfully and knowingly violated the 17 September 1984 order of the court. Mr. Douglas was once again held in contempt.

Judge O'Toole testified before the committee as follows:

MR. FUCHS: Again for members of the Committee, the transcript of the January 25, 1985 hearing is designated as Appendix YY. Did anything unusual happen at the hearing on January 25, 1985?

JUDGE O'TOOLE: Well, I again found Mr. Douglas in contempt, and I believe the record spells out why, but Mr. Douglas, I guess, didn't have much concern for the proceedings. He was more concerned about leaving the courtroom and continuing with other legal matters that he had scheduled on that date, which apparently—he had scheduled it for 10:00 a.m. and I think hearing started at 8:30 and he was obviously impatient to leave the courtroom, and said so.

\* \* \* \* \* \*

MR. CRUM: Your Honor, I'd be interested in knowing why you did not report the conduct to the Bar in light of the fact that you found an attorney in contempt?

JUDGE O'TOOLE: Well, I'll be very frank and candid with you, I should have but I didn't—just the press of time and perhaps I should have. My orders speak for themselves regarding how I analyzed Mr. Douglas' conduct.

MR. CRUM: How did you feel that conduct was in relationship to the respect that he showed for the orders of the court?

JUDGE O'TOOLE: Well, the orders speak for themselves but it looked to me like he was making a conscious effort to ignore and disregard the clear orders of the court.

\* \* \* \* \* \*

MR. CRUM: Did you feel like, during that period of time then from September through January, that he showed any attempt at any time to conform to the orders of the court?

JUDGE O'TOOLE: Well, he put $40,-500 in the account at the Continental—at the bank initially, so I guess there was some attempt, but this was all testified to and I concluded that his explanation

was not valid; and as I recall, in my minute orders I spelled out, "If there are any questions about the orders, come see me, or any problems." It was a—you know, it was incumbent upon he or his counsel, or both, or Mr. Derickson, if there was a concern about the scope of my orders to ask for a clarification, or to ask for some relief if they were unable to comply and none of that was ever done. I don't like—you know, this is the first time I've ever held anyone in contempt, and this is the only time I've ever held anyone in contempt and it's an unpleasant task.

The Committee and the Commission found that the Respondent:

> ". . . attempted to frustrate discovery, disobeyed court orders, wrongly appropriated partnership assets, and misrepresented the value of property to be posted as security."

The Committee found Respondent's conduct violated particularly DR 1–102(A)(3), illegal conduct involving moral turpitude, DR 1–102(A)(4), conduct involving dishonesty, fraud, deceit or misrepresentation, DR 1–102(A)(5), conduct prejudicial to the administration of justice and DR 1–102(A)(6), conduct that adversely reflects on fitness to practice law, Rules of the Supreme Court. We agree.

### V. WERE THE SANCTIONS EXCESSIVE?

■ The purpose of bar discipline is to protect the public and not to punish the attorney. *In re Lurie*, 113 Ariz. 95, 95, 546 P.2d 1126, 1126 (1976). In the instant case, the Hearing Committee recommended suspension of the Respondent for seven months. The State Bar Commission reduced the amount of suspension from seven months to six months. Pursuant to Rule 41(a) of the Former Disciplinary Rules of the Arizona Supreme Court, a member suspended for more than six months, must go through the application process to be reinstated, whereas, a person who has been suspended for six months or less shall be reinstated pursuant to Rule 41(k), which allows the member to be reinstated without

complying with the other provisions of the rule. *See* Rule 41(a), (k) Ariz.R.S.Ct., 1987 Supplemental Pamphlet to Vol. 17A A.R.S., at 467. We disagree, however, with both the Committee and the Commission. The actions of the Respondent directly affected the property and legal position of his clients. His actions put them in financial risk and indeed caused his liability carrier to have to pay an amount for damages. We believe that both the Committee and the Commission erred on the side of leniency in this matter. The purpose of attorney discipline is to protect the public and not to punish the lawyer. As the Standards for Imposing Lawyer Sanctions state:

> The purpose of lawyer discipline proceedings is to protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely properly to discharge their professional duties to clients, the public, the legal system, and the legal profession.

ABA, *Standards for Imposing Lawyer Sanctions*, Standard 1.1 (1986).

In the instant case, the Respondent has been guilty of "fee gorging," failure to protect the interest of his client and most importantly a lack of candor before the Commission and the Committee. As the Standards for Imposing Lawyer Sanctions states:

> Aggravation or aggravating circumstances are any considerations, or factors that may justify an increase in the degree of discipline to be imposed.
>
> . . . Aggravating factors include: (f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process. . . .

ABA, *Standards For Imposing Lawyer Sanctions*, Standards 9.21, 9.22(f) (1986).

We believe the Respondent has shown a pattern of misconduct which warrants that the public be protected by disbarment rather than suspension. As we have noted:

> It occurs to us that it would be unfair to the public to permit an attorney who has been guilty of such unethical conduct as the evidence in this case discloses to continue the practice of the law. Some

of the acts charged, standing alone, might not call for such serious consequences, though at least two of them would, but all of them taken together show a course of conduct on the part of respondent incompatible with a proper appreciation by him of that confidential relation which an attorney should maintain toward his client. The protection of the public, not the punishment of the attorney guilty of unprofessional conduct, is the rule by which the courts are guided in solving the question whether a member of the bar should be allowed to continue the practice and, in this instance, the application of this principle, as we view the facts, denies respondent this right. It is therefore, the order of the court that he be disbarred....

*In re Russell,* 57 Ariz. 395, 406, 114 P.2d 241, 245 (1941).

## VI. DID THE HEARING COMMITTEE ERR IN DISMISSING COUNT FOUR?

■ In November, 1980, shortly before Mrs. Weil's death, Respondent borrowed the sum of $3,000 from Mrs. Weil. Respondent claims he gave Mrs. Weil a promissory note reflecting the loan at the going rate of interest, but there is no evidence to corroborate this claim. Respondent did not find the note among Mrs. Weil's personal effects after she died. Respondent did not retain a copy of the promissory note for his own records, despite his practice of keeping copies of contracts of indebtedness which he had signed. No one else was present when the transaction occurred. Respondent repaid the principal due on the note by crediting the account of Mrs. Weil's estate, but did not pay the interest due.

Respondent was charged in count four with violations of DR 1–102(A)(4), conduct involving dishonesty, fraud, deceit or misrepresentation; DR 1–102(A)(6), conduct which adversely reflects on fitness to practice law, and DR 5–104(A), business relations with a client.

After the Hearing Committee dismissed count four and the Commission agreed, Bar counsel appealed. *See* Ariz.R.S.Ct. 53(e), 17A A.R.S.

While we might agree with Bar counsel that Respondent violated one or more of the DR's, *see In re Kali,* 124 Ariz. 592, 606 P.2d 808 (1980); *In re Neville,* 147 Ariz. 106, 111–12, 708 P.2d 1297, 1302–03 (1985); *In re Staples,* 259 Or. 406, 410, 486 P.2d 1281, 1283 (1971), we are unable to reinstate count four because our rules do not allow us to review a dismissal of a charge.

> The decision of the commission shall be final as to dismissal, remand, probation and reprimand, a censure that is not appealed, or if part of a private discipline, restitution and assessment.

Ariz.R.S.Ct. 53(d)(2), 17A A.R.S.

## VII. WAS RESTITUTION PROPER?

The hearing committee recommended that the amount of $15,235 be paid to the Client Security Fund as restitution for excessive fees, including double billing. The reason for requiring the matter to be paid to the Client Security Fund was that the amount involved had been paid by Respondent's insurance carrier and therefore the client had suffered no actual loss.

■ The Commission disagreed with the Committee as the Commission believed they did not have authority to require restitution to the Client Security Fund. In this, the Commission was correct. The client had been repaid by the malpractice insurance carrier of the Respondent and even though we have stated that it is not appropriate to order a member to repay his malpractice insurer, *see, In re Scanlan, Jr.,* 144 Ariz. 334, 697 P.2d 1084 (1985), we can think of no other person or entity to whom the Respondent could be required to pay. Admittedly, this is a partial windfall in that it is an amount Respondent might not have to pay. He should not, however, be penalized for protecting his clients by maintaining his malpractice insurance. The purpose of attorney discipline is not to punish, but to protect the public. No matter how noble it is to expend money for the benefit of the Client Security Fund, it is not provided for by our rules.

The Respondent is found guilty of misconduct. Costs in the amount of $11,629.91 are assessed.

Respondent is disbarred.

GORDON, C.J., and HOLOHAN and MOELLER, JJ., concur.

FELDMAN, V.C.J., recused himself and did not participate in this decision.